No. 24-3147

**United States Court of Appeals for the Tenth Circuit**

---

**DEIRDRE COONES, as Executor of the
Estate of Olin Coones,**

**Plaintiff – Appellee,**

v.

**BOARD OF COUNTY COMMISSIONERS OF THE UNIFIED
GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY, KANSAS,
et al.,**

**Defendants – Appellants.**

---

**Brief of Appellants**

---

**Appeal from the United States District Court for the District of Kansas
The Honorable Julie A Robinson
Case No. 22-CV-02447-JAR**

David R. Cooper, KS #16690
Fisher, Patterson, Sayler & Smith, L.L.P.
3550 SW Fifth Street
Topeka, Kansas 66606
(785) 232-7761 - Office
(785) 232-6604 - Fax
dcooper@fpsslaw.com

**Oral Argument Requested**

## Corporate Disclosure Statement

Pursuant to Rule 26.1 and Rule 28, Defendants/Appellants are individuals and a municipality.

## Table of Contents

Table of Contents ................................................................................................2

Table of Authorities ...........................................................................................3

Prior or Related Appeals .....................................................................................6

Jurisdictional Statement ......................................................................................7

Statement of the Issues Presented for Review .....................................................8

Statement of the Case ..........................................................................................8

Summary of the Argument ..................................................................................22

Argument and Authorities ..................................................................................23

    I.    Standards of review. ...............................................................................23

    II.    Defendants Michael and Garrison are entitled to judgement as to the claims of a Due Process Violation based on fabricating and/or suppressing evidence (Count I). ....................................................................................27

        A.    The district court erred by holding an individual police officer can be liable for damages § 1983 for a *Brady* violation in the absence of bad faith-- evidence intentionally withheld for the purpose of depriving the plaintiff of the use of that evidence during his criminal trial. ..............................................27

        B.    The district court erred when (1) considering a due process/failure to preserve claim and (2) permitting such a claim in the absence of a showing of bad faith. ...............................................................................................39

        C.    The fabrication claim involves only Michael and he is entitled to judgment on that claim. ...................................................................................41

        D.    The Court misapplied the legal standard for personal responsibility of Michael and Garrison. .........................................................................43

III.    Defendants Michael and Garrison are entitled to qualified immunity on plaintiff's claim of malicious prosecution. ..........................................45

IV.    Alternatively Michael and Garrison are entitled to qualified immunity as no clearly established law places the question beyond debate, .........................52

IV.    The Unified Government is also entitled to judgment on Counts I and II. ....................................................................................................55

Conclusion ...........................................................................................56

Statement of Counsel as to Oral Argument ................................................57

Certificate of Compliance with Type-Volume Limit ...................................58

Certificate of Service ............................................................................58


Doc. 122 Corrected Memorandum and Order Granting in part and Denying in part Defendants' Motion for Summary Judgment.....................67

Doc. 123 Notice of Appeal ....................................................................117

Doc. 167 Memorandum and Order granting [129] Motion to Reconsider...........119

## Table of Authorities

## Cases

*Ahlers v. Schebil*, 994 F.Supp. 856 (E.D.Mich. 1998) ...................................... 30, 51

*Arizona v. Youngblood,* 488 U.S. 51 (1988).................................................... 33, 40

*Arnold v. City of Olathe*, 35 F.4th 778 (10th Cir. 2022)..........................................24

*Ashcroft v. al-Kidd,* 563 U.S. 731 (2011) ........................................................ 26, 53

*Bailey v. Twomey*, 791 Fed. Appx. 724 (10th Cir. 2019) ........................................54

*Banks v. Dretke*, 540 U.S. 668 (2004) ...................................................................28

*Beard v. City of Northglenn, Colo.*, 24 F.3d 110 (10th Cir. 1994).........................48

*Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019).....................................29

{460004}

*Bledsoe v. Carreno*, 53 F.4th 589 (10th Cir. 2022) .......................................... 34, 47

*Brady v. Maryland*, 373 U.S. 83 (1963) ........................................................ 28, 31

*Burke v. Regalado*, 935 F.3d 960 (10th Cir. 2019)......................................................40

*Chavetz v. County of Bernalillo*, 3 F. Supp. 3d 936 (D.N.M. 2014) ......................45

*City and County of San Francisco v. Sheehan*, 575 U.S. 600 (2015).............. 24, 26

*Cone v. Bell*, 556 U.S. 449 (2009) ................................................................28

*Cortez v. McCauley*, 478 F.3d 1108 (10th Cir. 2007) ...................................... 47, 54

*Cox v. Glanz*, 800 F.3d 1231 (10th Cir. 2015)............................................... 7, 26, 53

*Culver v. Armstrong*, 832 F.3d 1213 (10th Cir. 2016) ...........................................54

*Daniels v. Williams*, 474 U.S. 327 (1986) ........................................... 31, 32, 53, 54

*Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017) .......................................................29

*Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008) ............................................27

*Ganley v. Jojola*, 402 F. Supp. 3d 1021 (D.N.M. 2019).................................. 34, 36

*Giglio v. United States*, 405 U.S. 150 (1972) .................................................... 31, 34

*Goode v. Carpenter*, 922 F.3d 1136 (10th Cir. 2019)..............................................28

*Groh v. Ramirez*, 540 U.S. 551 (2004) ................................................................25

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ...........................................................25

*Jean v. Collins*, 221 F.3d 656 (4th Cir. 2000)........................... 29, 30, 31, 32, 33, 53

*Johnson v. City of Cheyenne*, 99 F.4th 1206 (10th Cir. 2024) ..................... 28, 43, 44

*Kerns v. Bader*, 663 F.3d 1173 (10th Cir. 2011) ............................................. 25, 47

*Kyles v. Whitley*, 514 U.S. 419 (1995)...................................................... 29, 31, 34

*Lee v. Nicholl*, 197 F.3d 1291 (10th Cir. 1999)......................................................55

*Lewis v. Tripp*, 604 F.3d 1221 (10th Cir. 2010) ................................................ 8, 25

{460004}

*Lindsey v. Hyler*, 918 F.3d 1109 (10th Cir. 2019) ....................................................24

*Lynch v. Barrett*, 703 F.3d 1153 (10th Cir. 2013) ............................................. 8, 56

*Messerschmidt v. Millender*, 565 U.S. 535 (2012) ........................................ 45, 46

*Michigan v. DeFillippo*, 443 U.S. 31 (1979) .................................................48

*Miller v. Arbogast*, 445 Fed. Appx. 116 (10th Cir. 2011) ...............................50

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) .................................................7

*Moore v. City of Wynnewood*, 57 F.3d 924 (10th Cir. 1995) .................................56

*Moore v. Illinois*, 408 U.S. 786 (1972) ......................................................31

*Mullenix v. Luna*, 577 U.S. 7 (2015) .........................................................26

*Myers v. Koopman*, 738 F.3d 1190 (10th Cir. 2013) ..............................................45

*Novitsky v. City of Aurora*, 491 F.3d 1244 (10th Cir. 2007) ..................................48

*Pauly v. White*, 874 F.3d 1197 (10th Cir. 2017) *cert. denied*, 138 S.Ct. 2650 (2018) ....................................................................................................26

*Pearson v. Callahan*, 555 U.S. 223 (2009) ............................................................25

*Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004) ...............................................34

*Ragsdell v. Reg'l Hous. All. of La Plata Cnty.*, 603 Fed. Appx. 653 (10th Cir. 2015) ....................................................................................................55

*Reid v. Simmons*, 163 F. Supp. 2d 81 (D.N.H. 2001), *aff'd*, 47 Fed. Appx. 5 (1st Cir. 2002) ....................................................................................................30

*Romero v. Fay*, 45 F.3d 1472 (10th Cir. 1995).........................................................47

*Sanchez v. Hartley*, 810 F.3d 750 (10th Cir. 2016) ..................................................48

*Soza v. Demsich*, 13 F.4th 1094 (10th Cir. 2021) ....................................................52

*St. John v. Justmann*, 771 F.2d 445 (10th Cir. 1985) ...............................................49

*Stewart v. Donges*, 915 F.2d 572 (10th Cir. 1990) ...................................................46

{460004}

*Stonecipher v. Valles*, 759 F.3d 1134 (10th Cir. 2014) .............................. 46, 47, 54

*Strickler v. Greene*, 527 U.S. 263 (1999) ............................................................28

*Taylor v. Meacham*, 82 F.3d 1556 (10th Cir. 1996) ..............................................45

*Timpanogos Tribe v. Conway*, 286 F.3d 1195 (10th Cir. 2002)............................55

*Truman v. Orem City*, 1 F.4th 1227 (10th Cir. 2021)............................................41

*Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987 (10th Cir. 2011) ......................24

*United States v. Agurs*, 427 U.S. 97 (1976) ..........................................................31

*United States v. Bagley*, 473 U.S. 667 (1985)........................................................31

*White v. Pauly*, 580 U.S. 73 (2017) ......................................................................53

*Wilkins v. DeReyes*, 528 F.3d 790 (10th Cir. 2008) ........................................ 45, 47

*Wilson v. Layne*, 526 U.S. 603 (1999) ..................................................................32

*Wright v. City of Philadelphia*, 409 F.3d 595 (3d Cir. 2005)................................46

*York v. City of Las Cruces*, 523 F.3d 1205 (10th Cir. 2008)...................................8

## Other Authorities

28 U.S.C. § 1291 .....................................................................................................7

28 U.S.C. § 1331 .....................................................................................................7

28 U.S.C. § 1343 .....................................................................................................7

Fed. R. Civ. P. 16 ...................................................................................................39

U.S. Const. amend. XIV, § 1 .................................................................................32

## Prior or Related Appeals

There are no prior or related appeals.

## Jurisdictional Statement

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 (providing original jurisdiction in the district courts for federal question and civil rights actions).

Defendants appeal pursuant to 28 U.S.C. § 1291, from the denial of qualified immunity as provided by *Mitchell v. Forsyth*, 472 U.S. 511, 524-30 (1985). The orders from which this appeal is taken were filed September 30, 2024 and October 1, 2024. Appellants' notice of appeal was filed October 1, 2024, and the docketing statement was filed October 15, 2024. As detailed below, denial of the defense of qualified immunity is a final order for purposes of 28 U.S.C. § 1291. *Mitchell*, 472 U.S. at 530. This appeal is an appeal from a final judgment under Fed.R.Civ.P. 54(b), and this Court has jurisdiction under 28 U.S.C. § 1291 as denial of the defense of qualified immunity is a final order for purposes of 28 U.S.C. § 1291. *Mitchell*, 472 U.S. at 530.

This Court can address a qualified immunity appeal even if the argument had been forfeited in district court because the issue involves a pure matter of law—and the clearly-established-law prong of qualified immunity involves a pure matter of law. *Cox v. Glanz*, 800 F.3d 1231, 1246 n.7 (10th Cir. 2015). "[J]urisdiction also extends to situations where a defendant claims on appeal that accepting the plaintiff's version of the facts as true, he is still entitled to qualified immunity." *York v. City of*

7

*Las Cruces*, 523 F.3d 1205, 1209 (10th Cir. 2008). "[I]if a district court concludes a reasonable jury could find certain specified facts in favor of the plaintiff, ... we must usually take them as true—and do so even if our own de novo review of the record might suggest otherwise as a matter of law." *Lynch v. Barrett*, 703 F.3d 1153, 1159 (10th Cir. 2013) (quotation marks omitted). This limitation doesn't apply when the version of events credited by the district court is blatantly contradicted by the record. *Lewis v. Tripp*, 604 F.3d 1221, 1225–26 (10th Cir. 2010).

### Statement of the Issues Presented for Review

I.   Michael and Garrison are entitled to judgment as to the claims of a Due Process Violation based on fabricating and/or suppressing evidence (Count I).

II.  Michael, Garrison and the Unified Government are entitled to judgment as to the malicious prosecution claim (Count II).

### Statement of the Case

On April 7, 2008, Kathleen Schroll (Kathleen) called her mother, Elizabeth Horton (Elizabeth), at approximately 2:20 a.m. and said "Pete's in the house and he said he is going to kill Carl. He said he is going to kill me, and he said he has his tracks covered so no one else will know who did it." The line then went dead. Elizabeth relayed the information to her son, Randy Horton. Randy called 911 at 2:23 a.m. and reported that Pete was at 47 South 78th Street trying to kill his sister and her husband. Appx.I, 264; Appx.II, 403-409; Appx.VI, 1513-17, 1524-25.

Officers were dispatched, knocked on the front door and received no answer, found the screen door closed, but the front door was halfway open. Upon entry, the

{460004}

officers found Kathleen, deceased, face up on the living room floor with a gunshot wound to the back of her head with a revolver lying on the floor near her left foot. Carl was found, deceased, lying on a bed in a bedroom with gunshot wounds to the left chest and left abdomen and an injury to his head. Appx.I, 264; Appx.VI, 1276-95.

Elizabeth and Randy arrived. Elizabeth told Officer Barajas that the suspect's name was Pete Coones and Kathleen had called her, was hysterical and said "He's getting us. He's trying to kill Carl and said he's going to get me, and he said he has his tracks covered where they're not going to find out it's him." Appx.I, 264; Appx.VI, 1276-1295; Appx.II, 351-52.

Detectives Michael and Garrison were called out to the scene at approximately 3:15 a.m. Detective Littlefield responded to the scene at about 3:00 a.m. Littlefield and ADA Edmond Brancart secured a search warrant for the crime scene. Littlefield returned to the scene with a search warrant and assisted the Crime Scene Investigation Unit (CSIU) process the house for evidence while Michael and Garrison interviewed witnesses. CSI Officers processed the scene for evidence. Appx.VI, 1303-23; Appx.II, 364-66.

Michael and Garrison walked through the house to become acquainted with the scene and then spoke with Elizabeth. They took a recorded statement from Elizabeth in which she related that Kathleen had been a caregiver to Pete's father,

Olin Senior; that Senior had left an inheritance to Kathleen that Pete felt should go to him. Elizabeth related that Carl had harassed Kathleen since he found out he was not the beneficiary of Senior's estate and insurance policies. Elizabeth related that Kathleen had made police reports concerning burglaries of the house she inherited from Senior and that Kathleen believed Pete was the suspect. Appx.I, 265; Appx.II, 373-75; Appx.VI, 1335-39.

Garrison considered the possibility the call was a murder-suicide while en route to the scene. Once arriving and seeing how Kathleen had been shot—with a contact wound to the back of the head—then learning of the phone call Kathleen made to Elizabeth, Garrison does not believe it was a murder-suicide. Appx.XI, 2874. Michael believed he was dealing with a double homicide, not a murder-suicide. *Id.*, 2918.

At about 6:00 a.m., Michael and Garrison took Scott Horton to the cul de sac where Pete lived. Michael did not see Pete's van at the residence. Appx.II, 375; Appx.XI, 2874, 2905-06.

Michael and Garrison took the recorded statement of Blair Hadley at approximately 6:35 a.m. Blair related that Kathleen had told her on Sunday, April 6, 2008, that she saw Pete at the QuikTrip on Saturday, April 5, 2008; that Pete had been driving his van; and that Pete confronted Kathleen outside in the parking lot of the QuikTrip about not being able to spend his father's money anymore. Appx.I,

10

103-05, 264; Appx.II, 375-76.

After learning that Pete was in his van about to leave his house with his children, Melody and Ben, Michael and Garrison drove to 81st and Kansas Avenue and arrested Pete, at about 7:00 a.m. on probable cause to believe Pete had killed Kathleen and Carl. Appx.I, 265; Appx.II, 376-66; Appx.XI, 2870-73.

Michael and Garrison interviewed Melody Coones. Melody related that she could not account for Coones' whereabouts while she had slept between 12:30 a.m. to 6:30 a.m. Melody related that Pete was in a legal battle with Kathleen over $100,000 and that Kathleen had forged checks on Senior's bank account. Appx.II, 377; Appx.VI, 1386-90. They interviewed Ben Coones. Ben related that he could not account for Coones' whereabouts while he had slept between 11:30 p.m. and 6:30 a.m. Ben related a belief Senior's caretaker had forged checks over $100,000 on his account and that Pete had filed a lawsuit about it. Ben also related that Pete's brown van had been parked, the evening of April 6, 2008, off the street but would have been visible from the street. Appx.II, 377-78; Appx.VI, 1386-95.

Michael and Garrison do not know if Melody and/or Ben Coones were handcuffed at any time and never saw them in handcuffs, though Michael would not disagree with them if they said they were, but if they were handcuffed it was not at his direction. Appx.XI, 2882, 2912; Appx.VI, 1387.

ADA Brancart was familiar with a prior investigation involving Kathleen

{460004}

Schroll in which Detective Bryan Block was investigating a claim of mistreatment of a dependent adult, Case No. 2006090046 and Pete Coones. Brancart sent an email to Garrison advising the elder abuse investigation. Appx.X, 2553; Appx.XI, 2857.

Michael and Garrison spoke with Pete beginning at about 10:00 a.m. on April 7, 2008. Pete was read his *Miranda* Rights signed the advisory. Pete related that Block and Brown had investigated the alleged theft or forgery by Kathleen on Senior's bank account. Pete said he dropped his children off at Stoney Point School and parked directly across from Kathleen's house. Pete identified his lawyer and Kathleen's lawyer and related that settlement discussions were occurring. Pete denied having any confrontation with Kathleen on April 5, 2008 at the Quik Trip. Pete related he had been home from 11:15 p.m. on April 6 until leaving to take his children to the bus stop when he was arrested the morning of April 7. Pete said his van had been parked behind the house to hide it to avoid repossession. When informed that he was the suspect for the homicide of Kathleen and Carl, Pete denied knowledge of their deaths, said he had never been in their house, said "it wasn't me," and "prove it." At 10:55 a.m., Pete asked for an attorney and invoked his rights under *Miranda,* and the interview was terminated. Pete was arrested. Appx.II, 378-79; Appx.VI, 1335-1422; Appx.XI, 2880-81, 2914-16.

Michael and Garrison drove Ben and Melody home, met Pete's wife Dierdre and interviewed her. Dierdre related that Pete had been in bed at about 11:30 p.m.

12

and was on his computer in their bedroom when she awoke at 6:15 a.m. Appx.II, 379; Appx.VII, 1668.

On April 7, Brancart emailed Garrison information about a prior investigation involving Coones, Senior, and Kathleen. Block, who worked in financial crimes, investigated Kathleen based on allegations by Senior and Coones of elder abuse before Senior's death. Brancart relayed that Kathleen had been taking care of Senior, and that "[s]he used his credit to buy QVC purses and women's shoes. She paid some of her own bills. She wrote a check to herself from [Senior] for her birthday, for something like $1,000. She converted [Senior's] Jeep over to her own ownership." Appx.X, 2553. Brancart told Garrison that Coones and Senior had consulted with him about the suspected elder abuse before Senior's death. Brancart advised that the last information he had was that Block was looking at her bank records. The case reports from the elder abuse investigation were included in the investigative file for the Schroll death investigation, including property reports logging 120 pages of checks and exemplars of Senior's signatures. Appx.XIV, 3807.

Traces on the revolver found at the crime scene revealed the .38 caliber Taurus revolver had been purchased in 1989 by Senior's daughter, Patsy. Blair had said she had seen the gun in Kathleen's purse. Appx.XIV, 381; Appx.VI, 1349-51.

On April 8, 2008, Michael executed an affidavit for an arrest warrant.

13

Appx.III, 530-35.[1] Also on April 8, 2008, Michael and Garrison met with prosecutors from the Wyandotte County District Attorney's Office. A judge issued an arrest warrant for Pete Coones on April 8, 2008, for the murders of Carl and Kathleen. Appx.XIV, 380-81; Appx.III, 536.

On April 8, 2008, ADA Victoria Meyer executed an information charging Coones with the murder of Kathleen and Carl. Id., 537-38. An amended information was filed April 10, 2008, also charging Coones with the murder of Kathleen and Carl. Id., 539.

On April 8, 2008, forensic pathologist Erik Mitchell, M.D. performed autopsies on the bodies of Carl and Kathleen in Topeka, Kansas. . Mitchell's autopsy report for Carl indicates that he died as a result of two gunshot wounds. Before the autopsies, . Mitchell was told that the decedents were found dead of gunshot wounds after a call had been placed by the female decedent "to a daughter, indicating there was an assault." Appx.IX, 2377. Mitchell concluded the cause of death for Carl and Kathleen were gunshot wounds, Kathleen had a contact gunshot wound to the back of her head with the bullet traversing from back to front into her nasal sinuses—nearly midline. Mitchell determined the manner of death for both Carl and Kathleen had been homicide. Appx.IX, 2363-81; Appx.VI, 1431-54. Mitchell, the pathologist

---

[1] The district court erroneously stated that both "Michael and Garrison executed an arrest affidavit for Mr. Coones." Appx.XIV, 3808. The record clearly reflects that only Michael executed the affidavit. Appx.III, 535.

did not ask for information from or input from Michael when determining manner of death. Appx.IV, 907.

. Mitchell did not receive any other information from the KCKPD about the circumstances of the Schrolls' deaths, and he did not request any additional information before he performed his autopsy. Mitchell cannot identify any unanswered questions that he had when he made his initial determination of the manner of Kathleen's death. Appx.XI, 2922-23.

On April 9, 2009, Michael and Garrison showed Blair Hadley a photo lineup. Blair identified Pete from the lineup. Blair also related that Kathleen kept a handgun. Michael and Garrison also took a recorded statement from Randy Horton. Randy related the phone call from Kathleen to Elizabeth and his call to 911; that he knew Pete had a legal battle with Kathleen over a life insurance policy on Senior; that Kathleen had inherited Senior's house, and he believed it was also a part of the lawsuit. Michael and Garrison secured and assisted in the execution of a search warrant on Pete's van. Appx.II, 346, 398-402, 410-14; Appx.IX, 2361.

On Monday, April 14, 2009, Michael and Garrison took another recorded statement from Elizabeth. Elizabeth related that Kathleen had told her Pete had broken into Kathleen's garage and stolen a Dixon riding lawnmower; the April 7 phone call from Kathleen; that Kathleen told her that she carried large sums of money for her work and that she carried a pistol in her purse for work and for

{460004}

protection. Further attempts by Michael and Garrison to gather information about a stolen lawnmower did not yield any information to corroborate the alleged theft. Appx.II, 382-83, 415-20; Appx.XI, 2876.

Also on Monday, April 14, 2009, Michael and Garrison went to the Midwest Regional Credit Union and spoke with Kathleen's supervisor, Thad Jones. Jones confirmed that Kathleen owned a handgun but said he had never seen it. Jones told the detectives that Kathleen was not required to transport money for her job. Appx.XIV, 383.

A preliminary hearing was held June 27, 2008, the court found probable cause and bound Pete Coones over for trial on both counts. Appx.III, 540-609.

Michael testified that he confronted Pete about whether his brown van was in fact at his house all night:

> I explained to him that, once I received information as far as who he was and where he lived, that I personally went to that residence and I didn't see his vehicle. He told me that he has his vehicle parked way around behind the house, to hide it from creditors that he owned [sic] money to. He feared that his vehicle may be repossessed. And I told him that when I went up to his house to try to find his vehicle, I didn't see it. I walked to the east side of his house, which would give me a view to the back yard. I—I— I will admit, if—if ***if there was anything that would have indicated that the vehicle was on the extreme west end of the house, I would not have been able to see it***; but we subsequently served a search warrant at that house, and I did see some tire marks. I went back up to the area where I initially began my walk-up; and if the van would have been anywhere near those tire marks, I—I would have seen it, regardless of the lighting conditions.

Appx.III, 589.

Pete Coones was tried January 20-23 and the jury returned a verdict of guilty for the for the first degree, premeditated murder of Kathleen Schroll and not guilty for the first degree, premeditated murder of Carl Schroll. Appx.IV-V, 611-1105. A new trial was ordered by the district court because of the failure by the prosecutor to timely disclose the report of the forensic examination of Pete's computer. Appx.X, 2562-63. On December 14-17, 2009, a second jury trial was held and the jury convicted Pete Coones of the first degree, premeditated murder of Kathleen Schroll. Appx.V-VII, 1155-1741.

**Quik Trip surveillance video** Blair Hadley testified at trial that the confrontation at Quik Trip was when Kathleen was going in and Pete was coming out of Quik Trip. Appx.VI, 1477.

Michael and Garrison went to the Quik Trip and viewed the surveillance video to see if they could see Kathleen and/or Pete as described by Blair. The available video was of the interior, including cash registers, and there was no video showing Pete or Kathleen and there was no video of the exterior of the store or the gas pumps. Appx.XI, 2877, 2905-06. Michael testified at trial about the QuikTrip video and the fact neither Kathleen nor Pete were seen on the video. Appx.VI, 1410-11, 1422-23. "It is undisputed that detectives did not collect or inventory the QuikTrip

surveillance video." Appx.XIV, 3830.[2] No CDs or recordings on CD were logged

with the investigation file for the Schroll death investigation. Appx.XI, 2884.

The district court noted as evidence, Coones' criminal defense attorney, Patty

Kalb, "spoke to Michael before trial about the encounter at QuikTrip that Blair had

relayed to the detectives. Michael told Kalb that 'he investigated it and could not

find the video.'" Appx.XIV, 3823 (citing Appx.XIII, 3294 ). This cited testimony,

verbatim, provides:

> Q. Okay. Did you question Michael concerning this alleged encounter
> at QuikTrip?
>
> A. Yes.
>
> Q. And did you ask him or did he say he had investigated that and could
> not find a video?
>
> A. He said he investigated it and could not find the video.

Michaels' inability to find the video is unsurprising given the undisputed fact the

video was not preserved. Appx.XIV, 3830. This testimony confirms, however, that

---

[2] This unambiguous factual finding that the video was neither collected nor
inventoried must be squared with another statement by the district court:

> It is uncontroverted that [Michael and Garrison] went to the
> QuikTrip and requested surveillance footage from April 5, that an
> employee burned a CD copy of the surveillance footage, that the
> detectives brought the CD back to the police station and viewed it, that
> the footage only showed the interior of the store, and that they did not
> see Kathleen or Mr. Coones on the video.

Appx.XIV, 3828. As reflected in the factual statement, even assuming the video was
viewed at the viewed at the police station, it was not preserved.

the fact of the QuikTrip surveillance video was disclosed to Coones' defense attorney (*i.e.*, was not withheld).

**Where the van was parked:** When he went to Pete's house at 6:00 a.m. on April 7, 2008, Michael did not see Pete's van there. Appx.II, 375; Appx.VI, 1340; 1530-33.

**Embezzlement:** Jones, Michael and Garrison do not recall Jones relating that Kathleen had embezzled money from the credit union or Jones giving Michael and/or Garrison a Suspicious Activity Report that Jones had prepared after learning of (1) Kathleen's death and (2) that Kathleen's ledger was out of balance. Michael and Garrison had no knowledge of Kathleen's alleged embezzlement from the credit union. Appx.XI 2886-87. Michael does not remember Jones talking about embezzlement or missing money. Appx.XI, 2900, 2908.

Michael testified that if he had been told about Kathleen's embezzlement he would have put that in a report. *Id*., 2901, 2909-10, 2919-20. Michael testified he had never seen the Suspicious Activity Report before and was not given the report by Jones. *Id*., 2909, 2919.

Michael and Garrison testified they did not know about Kathleen's embezzlement, that Thad Jones did not tell the detectives about the embezzlement, and that Jones did not give them the SAR, and they did not tell the prosecutor about it. Appx.XI, 2878, 2883; 2876. As did the district court and for purposes of summary

{460004}

judgment and this appeal, Defendants/Appellees credit Jones' 2020 testimony that he recalls telling the detectives about Kathleen's embezzlement, and that he gave them a copy of the report. Appx.XIV, 3814 n.37. It should be noted, however, that Jones testified on cross-examination that he could not recall whether he actually gave a copy of the report to the detectives. Appx.VIII, 1960:9-13.

**Forgeries on Seniors bank accounts:** In May 2007, after learning of the death of Senior, Block logged two property reports consisting of 120 pages of photocopied checks, 4 pages of photocopied checks, and two known signatures by Senior. Appx.X, 2417-45. The case reports from the elder abuse investigation, Case No. 2006090046, were included in the investigative file for the Schroll death investigation, Appx.III, 468-74, including the Property Reports logging the 120 pages of checks, and the exemplars of Senior's known signatures*, id.*

The KBI lab report was inconclusive, stated Senior could not be eliminated as the author, and the report did not conclude any of the documents had been forged. Appx.VIII, 1836; Appx.X, 2546. The KBI lab report was not placed with case file for Case No. 2006090046. Block placed the KBI Lab Report in his personal file, it was not scanned to the case file. Appx.VIII, 1865-66.

Relevant to this appeal, the pretrial order asserted the following claims under § 1983 against Michael and Garrison:

Count I: Due Process Violation (fabricating and suppressing evidence), 42 U.S.C. § 1983, against [Michael and Garrison]. These Defendants,

20

> acting individually and in concert, violated Coones's due process rights by fabricating evidence against him and suppressing exculpatory evidence, resulting in Coones's wrongful conviction and incarceration.
>
> Count II: Malicious Prosecution and Unlawful Pretrial Detention, 42 U.S.C. § 1983, against [Michael and Garrison]. These Defendants, acting individually and in concert, violated Coones's Fourth and Fourteenth Amendment rights by accusing him of criminal activity without genuine probable cause, making knowingly false statements regarding his purported culpability, and seizing Coones without probable cause, resulting in Coones's wrongful detention.

Appx.I, 282-83. The Pretrial Order did not preserve a due process claim predicated on failure to preserve evidence. *Id.*

The district court granted summary judgment on all claims to individual defendants Dorsett, Sanchez, Block and Brown. The district court granted summary judgment to defendants Michael and Garrison as to the claims of conspiracy, failure to intervene but denied qualified immunity to Michael and Garrison as to plaintiff's claim of fabrication of evidence and withholding/suppression of exculpatory evidence and malicious prosecution.

The district court recited the following additional material facts discovered after Coones' conviction which were considered when vacating the conviction but which plaintiff does not attribute to either Michael or Garrison.

- **GSR Tests**

> On April 18, 2019, the KBI Lab tested the GSR swabs originally taken as evidence in Coones' case for pGSR. No GSR was detected on the swabs taken from Coones' van, no GSR was detected on Kathleen's right hand, but there was GSR on Kathleen's left hand.

{460004}

**• Pillow**

CSI Officers Barajas, Dressler, and Harper had collected a multi-colored pillow found near Carl's body at the crime scene. On September 29, 2020, an investigator for the prosecutor's office found a fourth bullet in the stuffing of the pillow that was lying near Carl Schroll's head at the site of his murder.

**• KBI Document Examination of Senior's Checks**

Part of the elder abuse investigation by Detective Block before Kathleen's death involved consulting with an expert document examiner from the KBI, who issued a report on July 27, 2007. The report identifies Kathleen as a suspect, and the examiner found "strong indications" that all but three of the 120 checks submitted for review may not have been authored by Senior, although due to the poor quality of the copies sent for evaluation, "he could not be eliminated as the author." This report was not included in the Schroll death investigation case file with the other documents from that investigation. Instead, Detective Block placed it in his personal file.

Appx.XIV, 3815-16.

## Summary of the Argument

The due process claims are based on plaintiff's claims that:

(1)     Michael and Garrison withheld and/or suppressed:

    (1)     the evidence of Kathleen's embezzlement from the credit union (*i.e., Brady* claims), and

    (2)     the Quiktrip surveillance video, and

(2)     Michael "fabricated" evidence that Pete's van was not at his house when Michael went to the cul de sac at 6:00 a.m. on April 7 (*i.e.,* fabrication claim).

The district court held the so-called *Brady* violation arose from the cumulative impact of the "withholding" of (1) evidence of Kathleen's embezzlement, (2) the

check forgery report, and (3) the detectives' review of the QuikTrip video. Appx.XIV, 3824-29. The district court erred in the following respects:

1.    The district court erroneously held Michael and Garrison can be held liable under § 1983 for a deprivation of due process for withholding evidence without a *mens rea* or scienter requirement.

2.    The fact of the QuikTrip video was not withheld. It is undisputed that the QuikTrip video was not collected or inventoried. Coones' defense attorney asked Michael about the video and confirmed it was unavailable. The fact the QuikTrip video was viewed and did not show either Kathleen or Pete Coones was introduced at both trials. Thus, the QuikTrip video involves a failure to preserve evidence which is a claim not preserved in the pretrial order,

3.    The forgery report was unknown to Michael and Garrison and was attributable only to Defendant Block (who was granted summary judgment).

4.    When determining the materiality and cumulative impact of "withheld evidence" the district court included and considered evidence that was not withheld and withheld evidence that is not attributable to Michael or Garrison.

As to the malicious prosecution claim, probable cause existed or, alternatively, arguable probable cause existed.

As to the pendent appeal by the Unified Government, provided this Court finds there was no underlying constitutional violation, the Unified Government is entitled to judgment on that basis.

## Argument and Authorities

## I.    Standards of review.

Summary judgment is appropriate when there exists no genuine issue of

{460004}

material fact, such that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). This Court reviews a district court's denial of a summary-judgment motion asserting qualified immunity *de novo*. *Arnold v. City of Olathe*, 35 F.4th 778, 788 (10th Cir. 2022). "In applying this standard, we view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 997 (10th Cir. 2011). The summary-judgment standard requires the court to view the evidence and draw inferences in the manner most favorable to the non-moving party. *Lindsey v. Hyler*, 918 F.3d 1109, 1113 (10th Cir. 2019).

In cases where, as here, defendants asserted the affirmative defense of qualified immunity, a plaintiff must also satisfy a familiar two-part burden. *Lindsey,* 918 F.3d at 1113; *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). The plaintiff must not only demonstrate that the defendant violated a constitutional right, but also that the right was clearly established at the time of the violation. *Lindsey*, 918 F.3d at 1113.

Qualified immunity protects officers from suit when the officer does not violate clearly established statutory or constitutional rights of which a reasonable officer would have known. *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015). Because qualified immunity is "the norm" in actions against public officials, officials enjoy a presumption of immunity when the defense is raised.

*Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982)). "Law enforcement officers are, of course, entitled to a presumption that they are immune from lawsuits seeking damages for conduct they undertook in the course of performing their jobs." *Kerns v. Bader*, 663 F.3d 1173, 1180 (10th Cir. 2011).

A plaintiff overcomes the presumption of immunity "only by carrying the heavy burden of showing both that (1) the defendant-officer in question violated one of his constitutional rights, and (2) the infringed right at issue was clearly established at the time of the allegedly unlawful activity such that every 'reasonable official would have understood that what he [was] doing' violated the law." *Kerns*, 663 F.3d at 1180 (quoting *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011)). "Failure on either qualified immunity element is fatal to the plaintiff's cause." *Id.* The court has discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Qualified immunity applies regardless of whether the official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez*, 540 U.S. 551, 567 (2004). Qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the

{460004}

law.'" *Sheehan*, 575 U.S. at 611 (quoting *al-Kidd*, 563 U.S. at 743).

To be clearly established, existing case law must place a constitutional question beyond debate. *Id.*; *see also Pauly v. White*, 874 F.3d 1197, 1222 (10th Cir. 2017) *cert. denied*, 138 S.Ct. 2650 (2018) (requiring a United States Supreme Court or Tenth Circuit decision on point). The right cannot be defined at high levels of generality, but instead the focus "is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (emphases original) (quoting *al-Kidd,* 563 U.S. at 741). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id*. at 11 (quotation omitted). *See also Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011).

"Federal appellate courts typically do not have jurisdiction to review denials of summary judgment motions, but the denial of qualified immunity to a public official is immediately appealable to the extent it involves abstract issues of law." *Cox v. Glanz*, 800 F.3d 1231, 1242 (10th Cir. 2015) (cleaned up). "Specifically, we have jurisdiction to review (1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, or (2) whether that law was clearly established at the time of the alleged violation." *Id*. (cleaned up). "Those facts explicitly found by the district court, combined with those that it likely assumed, [ ] form the universe of facts upon which we base our legal review

26

of whether defendants are entitled to qualified immunity." *Fogarty v. Gallegos*, 523

F.3d 1147, 1154 (10th Cir. 2008).

## II. Defendants Michael and Garrison are entitled to judgement as to the claims of a Due Process Violation based on fabricating and/or suppressing evidence (Count I).

The district court erroneously expanded the claims preserved in the pretrial

order from claims limited to withholding and fabricating evidence to include a claim

of failure to preserve evidence. *See Pretrial Order*, Appx.I, 282-83. "In Count I,

Plaintiff alleges due process violations against Defendants [Michael and Garrison]

for withholding, *failing to preserve*, and fabricating evidence." Appx.I, 3822 (Doc.

122, 26) (emphasis added). Plaintiffs, on summary judgment, pressed only three

categories of evidence for the withholding claim: "Kathleen's embezzlement, the

KBI expert report about Senior's checks during the earlier elder abuse investigation,

and the detectives went to QuikTrip, watched the surveillance video, and did not see

Kathleen and Coones on the footage arguing as she had reported." *Id.*, 3823.

### A. The district court erred by holding an individual police officer can be liable for damages § 1983 for a *Brady* violation in the absence of bad faith--evidence intentionally withheld for the purpose of depriving the plaintiff of the use of that evidence during his criminal trial.

Plaintiff asserts a due process violation claiming Michael and Garrison

suppressed (or withheld) exculpatory evidence resulting in Coones' wrongful

conviction and incarceration. Appx.I, 282 (Pretrial Order, Count I). This type of claim

arises under the line of cases commencing with *Brady v. Maryland*, 373 U.S. 83 (1963). *Johnson v. City of Cheyenne*, 99 F.4th 1206, 1226 (10th Cir. 2024).

The starting point for a *Brady* claim requires that the proponent "show that '(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material.'" *Goode v. Carpenter*, 922 F.3d 1136, 1149 (10th Cir. 2019) (quoting *United States v. Ford*, 550 F.3d 975, 981 (10th Cir. 2008)). "[E]vidence is 'material' … when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469–70 (2009) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

In the *habeas* context, where culpability and liability for damages under § 1983 are not at issue, the Supreme Court imposes no scienter or *mens rea* requirement for a *Brady* violation:

> There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler v. Greene*, 527 U.S. 263, 281–82 (1999) (reviewing the reversal of a grant of *habeas corpus*). Prejudice satisfying the third element exists "when the suppressed evidence is material for *Brady* purposes." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (internal quotations omitted). Favorable evidence "is material … 'if there

is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Thus, the *Brady* duty is a no-fault duty. *Jean v. Collins*, 221 F.3d 656, 663 (4th Cir. 2000). Individual liability under § 1983, however, requires more than fault/negligence—it requires proof of an affirmative abuse of power or intentional misconduct. No Supreme Court or Tenth Circuit case holds liability for damages under § 1983 for mere negligence but the district court's decision erroneously holds otherwise.

A *Brady* claim against individual defendants under § 1983 requires a showing of intentional misconduct—something more than mere negligence. *See e.g.*, *Darnell v. Pineiro*, 849 F.3d 17, 36 (2d Cir. 2017) (any § 1983 claim for violation of due process requires proof of *mens rea* greater than mere negligence); *Bellamy v. City of New York*, 914 F.3d 727, 751 n.23 (2d Cir. 2019) (a civil *Brady* claim requires a showing that the non-disclosure was intentional). No Supreme Court case holds an individual could be liable for money damages under § 1983 for violating *Brady* in the absence of intentional misconduct.

Here, the claim is Michael and Garrison knew or should have known of the significance of the allegedly withheld evidence and disclosed it, not that either of them understood the exculpatory value and deliberately concealed that information.

> To prevail against [the defendant police officer] on his §1983 claim, [the plaintiff] was obligated to prove, by a preponderance of the

evidence, three essential elements: First, that his Brady rights were, in fact, violated during the course of his underlying state criminal prosecution; second, that [the defendant police officer's] conduct caused that violation; and finally, that [the defendant police officer] acted with the requisite culpable state of mind.

*Reid v. Simmons*, 163 F. Supp. 2d 81, 85 (D.N.H. 2001), *aff'd*, 47 Fed.Appx. 5 (1st Cir. 2002). *See also Ahlers v. Schebil*, 994 F.Supp. 856, 871 (E.D.Mich. 1998) (concluding that proving an underlying *Brady* violation is only one element of a § 1983 claim against police officers), *aff'd*, 188 F.3d 365 (6th Cir.1999).

[T]o overcome the defense of qualified immunity and maintain a claim against a police officer for his or her investigation of a case, a plaintiff must show that an officer acted recklessly, maliciously, or intentionally to violate a clearly established federal constitutional or statutory right of which a reasonable official, in the defendant officer's position, would have known. [Citation omitted.] That is, the cloak of qualified immunity shields state employees from liability so long as they acted under the "objectively reasonable" belief that what they were doing was lawful[.]

*Ahlers*, 994 F. Supp. at 871–72.

The duty to disclose exculpatory evidence under *Brady* rests with the prosecution, not with police officers. *Jean,* 221 F.3d at 660; *Mowbray v. Cameron Cnty., Tex.*, 274 F.3d 269, 278 (5th Cir. 2001) ("*Brady* imposes a duty on prosecutors to share exculpatory evidence with the defense. [… Our research reveals] no case extending *Brady* to police officers or lab technicians."). The Supreme Court decisions establishing the *Brady* duty on the part of prosecutors do not address whether a police officer independently violates the Constitution by withholding from the prosecutor

{460004}

evidence acquired during an investigation. *See, e.g., Brady*, 373 U.S. 83; *Giglio v. United States*, 405 U.S. 150 (1972); *United States v. Agurs*, 427 U.S. 97 (1976); *United States v. Bagley*, 473 U.S. 667 (1985). Without direction or authority from the Supreme Court, the district court's decision here extends that no-fault duty to the police and permits liability for damages under § 1983 for mere negligence.

In sum, a *Brady* violation (the withholding of material exculpatory or impeachment evidence) may be sufficient to overturn a conviction. However, a *Brady* violation, in and of itself, is not sufficient to impose liability for damages under § 1983 upon an officer that did not intentionally (or in bad faith) withhold the evidence or where the officer lacked knowledge of its evidentiary value. Thus, it is incorrect to frame the duty under *Brady* as a duty binding upon police officers because the *Brady* duty, as defined by the Supreme Court, has always been defined as one that rests with the prosecution. *Brady*, 373 U.S. at 87; *Giglio*, 405 U.S. at 154 763; *Moore v. Illinois*, 408 U.S. 786, 794 (1972); *Agurs*, 427 U.S. at 108; *Bagley*, 473 U.S. at 676; *Kyles*, 514 U.S. at 437. "To hold that the contours of the due process duty applicable to the police must be identical to those of the prosecutor's Brady duty would thus improperly mandate a one-size-fits-all regime." *Jean*, 221 F.3d at 660.

This follows from the Supreme Court's holding that "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 328 (1986). The

31

Fourteenth Amendment mandates, "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Under *Daniels* and a matter of plain constitutional text, no "deprivation" occurs on account of official negligence. 474 U.S. at 330–33. Negligent conduct, by definition, cannot establish the "affirmative abuse of power" necessary to constitute a due process deprivation. *Id*. at 330–32. Under *Daniels*, negligence or inadvertence by failing to turn over evidence cannot be actionable under § 1983. *Jean*, 221 F.3d at 660.

It is improper to hold the police liable for due process violations under § 1983 where they have acted in good faith. "[T]he Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels*, 474 U.S. at 328. *Daniels* holds that no "deprivation" occurs on account of official negligence. 474 U.S. at 330–33. Negligent conduct cannot establish the "affirmative abuse of power" necessary to constitute a due process deprivation. *See id*. at 330–32.

Here, the due process claim of withholding/suppressing evidence can be resolved on the first prong of the immunity analysis where there is no constitutional violation. *Wilson v. Layne*, 526 U.S. 603, 609 (1999). Liability under § 1983 "requires that the officer have intentionally withheld the evidence for the purpose of depriving the plaintiff of the use of that evidence during his criminal trial." *Jean*, 221 F.3d at 663. Thus, the district court erred when stating "bad faith would only be required if

32

[plaintiff were asserting] a failure-to-preserve claim." Appx.XIV, 3829. The district court also erred when holding it was clearly established that a plaintiff could prevail on a § 1983 claim for damages against an individual defendant in the absence of bad faith or intentionally withholding evidence for the purpose of depriving the plaintiff of the use of that evidence during his criminal trial. *Id.*

In addition to the discussion of *Daniels, supra,* the Supreme Court in *Youngblood*, refused to find that police officers violated the Due Process Clause in the absence of evidence that they acted in bad faith. *Arizona v. Youngblood,* 488 U.S. 51 (1988). *Youngblood*, which dealt with the failure to preserve evidence, sets forth principles that apply to plaintiff's claims. Here, as in *Youngblood*, the prosecutor and ultimately the defense allegedly failed to receive exculpatory evidence from the police (a failure to procure the evidence or a failure to document evidence). Here, as in *Youngblood*, the police officers' actions are alleged to constitute a due process violation. *Youngblood* stressed "unwillingness" to read the Due Process Clause to impose "on the police an undifferentiated and absolute duty" in that context. *Id.*

Neither the Supreme Court nor the Tenth Circuit has imposed a sweeping duty on police on the facts shown. The law instead places ultimate responsibility upon the prosecutor for disclosing *Brady* material to the defense. When *Brady* violations occur, criminal defendants may have their convictions overturned. Because police knowledge is imputed to the prosecution for purposes of the prosecutor's *Brady*

duties, *Kyles*, 514 U.S. at 437–38, the prosecutor bears the responsibility for implementing procedures designed to ensure that police officers turn over all evidence to the prosecutor, *Giglio*, 405 U.S. at 154.

This Court's decision in *Bledsoe v. Carreno*, 53 F.4th 589, 613 (10th Cir. 2022), points to the 2004 decision in *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004) that "'[l]ong before' 1986, it was clearly established 'that a defendant's due process rights are implicated when the **state** … withholds exculpatory evidence from the defense." 53 F.4th at 613 (quoting *Pierce*, 359 F.3d at 1299) (emphasis added). *Bledsoe* and *Pierce* were both decided on motions to dismiss and addressed the sufficiency of the allegations in the complaint to defeat a motion to dismiss. *Bledsoe,* 53 F.4th at 594-95; *Pierce*, 359 F.3d at 1282. The *Bledsoe* decision suggests the threshold for individual liability requires proof the defendant <u>knowingly</u> fabricated false evidence or knowingly suppressed exculpatory evidence that would have proven innocence. 53 F.4th at 608 ("None of those alleged actions, by definition, can be done mistakenly or 'innocently.'"). This, consistent with *Youngblood,* implies that a plaintiff must show bad faith on the part of the police for a claim under § 1983. 488 U.S. at 58. The decision in *Ganley v. Jojola*, 402 F. Supp. 3d 1021 (D.N.M. 2019) is instructive.

> Although the Tenth Circuit has not explored the reach of [*Brady*] in the context of a § 1983 action against police officers alleged to have withheld potentially exculpatory evidence from the prosecution, the Fourth Circuit addressed this issue in *Jean v. Collins. See Jean v.*

34

*Collins*, 221 F.3d at 656. In [*Jean*,] six circuit judges, sitting en banc, declined to find police officers liable absent a showing of bad faith, because "the prosecutor bears the responsibility for implementing procedures designed to ensure that police officers turn over all evidence to him." 221 F.3d at 661. Under the same analysis, even assuming that Jojola acknowledged his error in time to affect the proceedings against Ganley, Ganley cannot assert a claim on these grounds absent a showing that Jojola deliberately withheld this realization from the prosecution, which Ganley has not alleged here.

Further support for a "bad faith" liability requirement is seen in [*Youngblood*], [ ], a case with analogous concerns over the disposition of potentially exculpatory evidence. In [*Youngblood*], the Supreme Court refused to find that police officers violated the Due Process Clause in the absence of evidence that the officers acted in bad faith. See 488 U.S. at 58[ ]. [*Youngblood*] involved police who failed to refrigerate clothing that contained semen stains and to perform tests on other semen samples. 488 U.S. at 53-55[ ]. The defendant argued that properly preserved evidence might well have shown that he was innocent of any sexual assault. The [*Youngblood*] Court held, however, that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 58[ ].

Although [*Youngblood*] dealt with the failure to preserve evidence, its principles are applicable to the facts as alleged by Ganley. Here, as in [*Youngblood*], the prosecutor failed to receive exculpatory evidence from the police, and here, as in [*Youngblood*], the police officer's actions were alleged to constitute a due process violation. The [*Youngblood*] Court stressed its "unwillingness" to read the Due Process Clause to impose "on the police an undifferentiated and absolute duty to retain ... material that might be of conceivable evidentiary significance." 488 U.S. at 58[ ].

The Court approves of a "bad faith" requirement for police officer liability and notes several obvious drawbacks to imposing the kind of sweeping disclosure duty on police that Ganley suggests would have avoided the alleged due process violation resulting from Jojola's nondisclosure. For example, because prosecutors enjoy absolute immunity in the exercise of their prosecutorial functions, which include the disposition of Brady material, such a duty would widen the legal

gulf between prosecutors and police to an extent that would turn police officers into scapegoats for every item of exculpatory evidence discovered post-arrest. To confer on prosecutors absolute immunity while denying such immunity to police would increase § 1983 claims against all officers, even those who exercise their ministerial functions with great concern for the rights of the accused.

Moreover, the fact that the law has already placed on prosecutors ultimate responsibility for the disclosure of exculpatory evidence indicates that police knowledge is imputed to the prosecution for purposes of the prosecutors' Brady duties. *See* [*Kyles*], 514 U.S. 419, 437-38[ ](1995)("*Kyles*")("[T]he prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all [exculpatory] evidence."); *[Giglio}*, 405 U.S. 150, 154[ ]("[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor."). Thus, the prosecutor bears the responsibility for implementing procedures designed to ensure that police officers turn over relevant evidence. To hold otherwise -- that officers are responsible under § 1983 for the types of communication failures that *Kyles* and *Giglio* charge the prosecution with preventing -- would encourage unproductive exercises in finger-pointing and ultimately drive the federal courts deep into the processes of state administrative offices, a breach of federalism principles for which the Due Process Clause provides no authorization.

402 F. Supp. 3d at 1093.

Because liability for damages under § 1983 for a *Brady* violation by an individual police officer requires a showing of bad faith or intentionally withholding evidence for the purpose of depriving the plaintiff of the use of that evidence during his criminal trial, Defendants Michael and Garrison are entitled to qualified immunity because (1) there was no showing of such bad faith or intent and (2) it is not clearly established that in individual officer can be liable under § 1983 on a lesser showing.

36

The due process claims are based on plaintiff's claims that:

(1)    Michael and Garrison withheld and/or suppressed:

    (1)    the evidence of Kathleen's embezzlement from the credit union (*i.e., Brady* claims), and

    (2)    the Quiktrip surveillance video, and

(2)    Michael "fabricated" evidence that Pete's van was not at his house when Michael went to the cul de sac at 6:00 a.m. on April 7 (*i.e.,* fabrication claim).

The district court held the so-called Brady violation arose from the cumulative impact of the "withholding" of (1) evidence of Kathleen's embezzlement, (2) the check forgery report, and (3) the detectives' review of the QuikTrip video. Appx.XIV, 3824-29. The district court erroneously held Michael and Garrison can be held liable under § 1983 for deprivation of due process for withholding evidence without a *mens rea* or scienter requirement.

The fact of the QuikTrip video was not withheld—the video itself was not preserved but the fact the video had been reviewed was disclosed. Coones' defense attorney asked Michael about the video and confirmed it was unavailable. The fact the QuikTrip video was viewed and did not show either Kathleen or Pete Coones was introduced at both trials. Thus, the QuikTrip video involves a failure to preserve evidence which is a claim not preserved in the pretrial order,

The KBI expert report regarding forgery was unknown to Michael and Garrison. The fact the forgery report was not disclosed was attributable only to

{460004}

Defendant Block (who was granted summary judgment).

When determining the materiality and cumulative impact of "withheld evidence" the district court included and considered evidence that was not withheld and withheld evidence that is not attributable to Michael or Garrison.

For the QuikTrip video, Plaintiff asserts only a *Brady* withholding claim, not a failure to preserve claim. *See* Pretrial Order, Appx.I, 282-83 (advancing claims only for withholding and fabricating evidence, not failure to preserve); Appx.XI, 2955-59 (advancing arguments about the video only as a withholding claim and explicitly stating "Plaintiff alleges *Brady* violations in this case, not [failure to preserve] violations of *Youngblood*.). "It is undisputed that detectives did not collect or inventory the QuikTrip surveillance video." Appx.XIV, 3830. Nonetheless, Coones' criminal defense attorney was informed the video had been viewed and the fact it did not show Kathleen or Pete was admitted during the trial.

In sum, it is clear and undisputed that the QuikTrip video was not preserved. The record is also clear (and it is also undisputed) that Michaels testified about viewing the QuikTrip video and the fact the video showed neither Kathleen nor Pete. Thus, it was error for the district court to make a materiality conclusion under *Brady* while considering both the forgery evidence (which is not attributed to Michael or Garrison) and the QuikTrip video (which was not preserved and not withheld).

Regarding the evidence of embezzlement, there is no evidence that it was

intentionally suppressed. The evidence suggests Thad Jones might have mentioned the embezzlement and might have given the SAR to Michael and/or Garrison. Mr. Jones has no memory of what he told (or didn't tell) the detectives or what he gave (or didn't give) to them. As we must, however, we credit Jones testimony during the 1507 hearing that he did so.

Assuming, however, that the informatoin was given to Michael and/or Garrison the only reasonable inference from the evidence, was that neither detective perceived any materiality to the information. Alleged embezzlement by Kathleen from her employer had no readily apparent relevance to the case on April 14, 2008 (the day they interviewed Jones). That Kathleen was believed to have defrauded Coones Senior was included in the investigation file. Certainly, there was no evidence of bad faith in the omission of that information from Michael's report and the omission was, at most, negligence. As a matter of law, negligence alone is insufficient to state a constitutional claim.

**B.    The district court erred when (1) considering a due process/failure to preserve claim and (2) permitting such a claim in the absence of a showing of bad faith.**

Again, Plaintiff asserts only a *Brady* withholding claim, not a failure to preserve claim. *See* Pretrial Order, Appx.I, 282-83. Thus, the district court erred in concluding plaintiff could proceed on such a claim.

A pretrial order entered pursuant to Fed.R.Civ.P. 16(e) supersedes the

pleadings and controls the subsequent course of litigation and determines the dimensions of the lawsuit, both in the trial court and on appeal. *Burke v. Regalado*, 935 F.3d 960, 1005 (10th Cir. 2019) (cleaned up). The omission of a failure to preserve claim was, according to plaintiff, intentional. Thus, the district court erred by holding plaintiff could proceed on such a claim. Appx.XIV, 3830-31.

If, notwithstanding the failure to preserve such a claim in the pretrial order, plaintiff was permitted to advance a failure to preserve claim under *Youngblood* and *Trombetta*, the district court erred when holding plaintiff was not required to make a showing of bad faith for such a claim. The district court held that a failure to preserve claim could proceed absent a showing of bad faith premised on its earlier finding of materiality under *Brady*. Appx.XIV, 3830. This contravenes the Supreme Court's holding in *Youngblood,* In *Youngblood*, the Supreme Court refused to find that police officers violated the Due Process Clause in the absence of evidence that the officers acted in bad faith. 488 U.S. at 58. "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.,* at 56 n. *Youngblood* held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.,* at 58.

*Youngblood* required that there be a showing of bad faith and that the

{460004}

exculpatory value of the evidence was apparent to the detectives at the time they encountered it.

### C. The fabrication claim involves only Michael and he is entitled to judgment on that claim.

Plaintiff also asserted a due process claim based on fabrication of evidence which requires that Plaintiff demonstrate:

> (1) the defendant knowingly fabricated evidence, (2) the fabricated evidence was used against the plaintiff, (3) the use of the fabricated evidence deprived the plaintiff of liberty, and (4) if the alleged unlawfulness would render a conviction or sentence invalid, the defendant's conviction or sentence has been invalidated or called into doubt.

*Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021) (footnotes omitted).

The district court erroneously concluded that Defendants' motion was insufficient to invoke qualified immunity, or otherwise move for summary judgment, on Plaintiff's fabrication claim. The evidence allegedly fabricated was Michael's testimony about Coones' van.

The evidence was (1) that Michael went to Coones' residence at 6:00 a.m. and walked part-way up the cul de sac and could not see Coones' van from his vantage point and (2) there was an area in the back yard he would not have seen from his vantage point. The evidence, viewed in the light most favorable to Plaintiff does not support a fabrication claim against Defendant Michael. Plaintiff offered witness accounts that the van was parked *behind* Coones' house but in front of the vehicle

driven by Minks.

Defendants expressly argued "Defendants are entitled to judgment on plaintiff's claim of fabrication of evidence/suppression of exculpatory evidence." Appx.II, 310. Defendants also noted that this Court's decision in *Bledsoe* required "proof the defendant knowingly fabricated false evidence." *Id.,* 313 (citing *Bledsoe*, 53 F.4th at 608). Defendants' brief further noted that "Michael went to the cul de sac where Coones lived. He did not see Coones' van. Nothing during the investigation corroborated, as fact, that Coones' could not have used his van to commit the murder." *Id., 318*. Thus, Defendants invoked summary judgment and qualified immunity on the fabrication claim.

Further, the district court erred when concluding the summary judgment record, viewed in the light most favorable to Plaintiff, demonstrated a constitutional violation by virtue of fabrication of evidence by Michael. The evidence that Coones' witnesses stated the van was parked behind the house does not permit the inference that Michael fabricated evidence when Michael's testimony conceded that he didn't go behind the house and that the van could have been parked behind the house and he would not have seen it from his vantage point.

Defendants expressly argued they were "entitled to judgment on plaintiff's claim of fabrication of evidence/suppression of exculpatory evidence. Appx.II, 310 The district court erred by inferring far more into Michael's testimony than what he

said. Michael did not testify that it was impossible for Coones' van to have been parked behind the house without him seeing it. Rather, he readily conceded that there were areas behind the house he couldn't see and the van could have been parked there. There is no evidence that any of the witnesses who said the van was at the house were talking about the same place/position to which Micheal was referring during his testimony.

Further, the district court erred by denying summary judgment to Garrison. The district court denied summary judgment to both Michael and Garrison on Count I, which encompassed both the *Brady*/withholding claim and the fabrication claim.

A plaintiff must demonstrate that each individual defendant had direct personal responsibility for the claimed deprivation of constitutional rights under *Brady*, or *Trombetta/Youngblood*, and that the individual acted with the requisite mental state. *Johnson*, 99 F.4th at 1232. Specifically, Plaintiff must show that Garrison herself, acted with deliberate or reckless intent. *Id*. The evidence is clear that Garrison (1) did not prepare the investigative report, (2) did not testify at the preliminary hearing, and (3) did not testify at Coones's trials. There was no evidence or discussion of any alleged fabrication by Garrison and she is entitled to summary judgment on that basis.

**D.    The Court misapplied the legal standard for personal responsibility of Michael and Garrison.**

The district court held a reasonable jury could conclude that the Conduct by

43

Michael and Garrison went beyond mere negligence because they *should* have understood the importance of the evidence (embezzlement report, QuikTrip video and KBI expert report). Appx.XIV, 3833. However, this is not the test. The evidence viewed in the light most favorable to the plaintiff indicates, arguably, that the embezzlement report and QuikTrip video were given to Michaels and Garrison. Defendants credit this version for summary judgment. However, there is no evidence, other than supposition and speculation, that either Michael or Garrison somehow understood the exculpatory value of the evidence, suppressed the evidence, or did so intentionally. Plaintiff must find support for their claims in the evidence, and there is none. The *Trombetta* analysis must be applied and determine whether the evidence was material.

> "To qualify as constitutionally material in this sense, the evidence must: (1) 'possess an exculpatory value that was apparent [to the police] before the evidence was destroyed,' and (2) 'be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *Id*. (alteration in original) (quoting *Trombetta*, 467 U.S. at 489). Additionally, (3) "if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was 'potentially useful' for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence." *United States v. Bohl*, 25 F.3d 904, 910 (10th Cir. 1994) (quoting *Youngblood*, 488 U.S. at 58).

*Johnson*, 99 F.4th at 1226. Michael and Garrison are entitled to qualified immunity for lack of personal responsibility.

Additionally, Garrison is entitled to qualified immunity as Garrison (1) did

not prepare the investigative report, (2) did not testify at the preliminary hearing, and (3) did not testify at Coones's trials.

### III. Defendants Michael and Garrison are entitled to qualified immunity on plaintiff's claim of malicious prosecution.

The Tenth Circuit "has recognized the viability of malicious prosecution claims under § 1983." *Taylor v. Meacham*, 82 F.3d 1556, 1560 (10th Cir. 1996). Unreasonable seizures imposed with legal process may precipitate Fourth Amendment malicious-prosecution claims. *Myers v. Koopman*, 738 F.3d 1190, 1194 (10th Cir. 2013) (citing *Heck v. Humphrey*, 512 U.S. 477, 484, (1994)). This claim is premised on the theory that the defendant initiated or continued a proceeding against the plaintiff without probable cause. *Chavetz v. County of Bernalillo*, 3 F. Supp. 3d 936, 981-82 (D.N.M. 2014). A claim for malicious prosecution is distinguished from one for false arrest or false imprisonment in that the complained-of detention occurred after the institution of legal process. *Wilkins v. DeReyes*, 528 F.3d 790, 798 (10th Cir. 2008). Thus, the seizure is not the absence of legal process, but that the legal process itself was alleged to have been wrongful. *Id*.

A probable cause finding by a neutral judge "is the clearest indication that the officers acted in an objectively reasonable manner or … in objective good faith." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (internal quotation marks and citation omitted). This is not true where (1) the affidavit supporting the warrant was so lacking that a belief in probable cause based on it entirely unreasonable, (2) the

45

affiant knowingly, or with reckless disregard for the truth, includes false statements in the affidavit, or (3) the affiant knowingly or recklessly omits information which, if included, would have vitiated probable cause. *Id.; Stewart v. Donges*, 915 F.2d 572, 582-83 (10th Cir. 1990).

A plaintiff must "make a substantial showing of deliberate falsehood and reckless disregard for the truth by the officer seeking the warrant." *Stonecipher v. Valles*, 759 F.3d 1134, 1142 (10th Cir. 2014). The test is objective, allowing the Court to determine, as a matter of law, whether a reasonable officer could have found probable cause where there is no dispute over material facts. *Id.*

Michaels' affidavit contains no false statements. The affidavit does not omit information known which, if included, would have vitiated probable cause. A preliminary hearing was conducted June 27, 2008, after which the court found: "a crime has been committed as charged. There's probable cause to believe defendant is guilty thereof. He is bound over for trial." Appx.III, 607. Coones was convicted during each of two jury trials. None of the evidence offered to the court was false nor does any "omitted" evidence obviate probable cause. The probable cause standard also does not require officers to correctly resolve conflicting evidence or to make accurate credibility determinations. *Wright v. City of Philadelphia*, 409 F.3d 595, 603 (3d Cir. 2005) (disbelieving the suspect's story not unreasonable in light of the information the officers possessed at the time). Moreover, "once probable cause

{460004}

is established, an officer is not required to continue to investigate exculpatory evidence before arresting a suspect." *Cortez v. McCauley*, 478 F.3d 1108, 1121 n. 18 (10th Cir. 2007).

An officer that interviews witnesses and concludes probable cause exists to arrest is not required to accept or investigate the suspects alibi claim. *Romero v. Fay*, 45 F.3d 1472, 1477 (10th Cir. 1995). When evaluating a § 1983 malicious prosecution claim, the court begins with the common-law elements for malicious prosecution. *Wilkins*, 528 F.3d at 797. A plaintiff must show that "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." 528 F.3d at 799. *See also Bledsoe*, 53 F.4th at 614 (same). The key inquiry "is whether plaintiff has proven the deprivation of a constitutional right." *Wilkins*. 528 F.3d at 797.

Probable cause is not a precise quantum of evidence it does not, for example, require the suspect to be more likely guilty than not. *Stonecipher*, 759 F.3d at 1141. Instead, the question is whether "a substantial probability existed that the suspect committed the crime, requiring something more than a bare suspicion." *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011). The fact that "the suspect is later acquitted of the offense for which he is arrested is irrelevant" to this inquiry.

47

*Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979).

Malice, as required for a malicious-prosecution claim, requires that a defendant acted either "knowingly" or with "reckless disregard for the truth." *See Sanchez v. Hartley*, 810 F.3d 750, 755–56 (10th Cir. 2016) (citation omitted). Under Tenth Circuit law, malice is a distinct element. *See Novitsky v. City of Aurora*, 491 F.3d 1244, 1258–59 (10th Cir. 2007) (holding that the plaintiff had failed to establish a lack of probable cause and "the fourth (malice) element of a malicious prosecution claim"); *see also Mglej v. Gardner*, 974 1151, 1171 n.14 (10th Cir. 2020) ("[T]he malice element of a Fourth Amendment malicious prosecution claim focuses on the defendant officer's knowledge or state of mind.").

"The failure to investigate a matter fully, to 'exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence' rarely suggests a knowing or reckless disregard for the truth." *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994) (quoting *United States v. Dale*, 991 F.2d 819, 844 (D.C.Cir.), *cert. denied*, 510 U.S. 906 (1993)). "To the contrary, it is generally considered to be token negligence '*at most*.'" *Id.* (quoting *Dale*, 991 F.2d at 844).

There was probable cause for Coones' arrest, charge, trial and conviction, based upon

(1)    Kathleen's dying declaration identifying Pete Coones as the killer,

{460004}

(2)    Kathleen was shot in the back of the head with a contact wound,

(2)    Carl was found dead with two bullet wounds to the torso,

(3)    reports from Kathleen's family, Pete's family and from Pete himself of the ongoing dispute over Kathleen's acquisition of Senior's assets,[3] and

(4)    none of the people interviewed that were in Pete's house on April 7 could definitively account for his whereabouts at the time of the 911 call, and

(5)    the coroner (without consulting with or input from Michael or Garrison) concluded both Kathleen and Carl's deaths were homicide.

This probable cause was fixed when ADA Meyers filed the criminal complaint on April 8, 2008 (the day after the deaths). None of the evidence identified by the plaintiff or the district court obviates that probable cause. "[E]xistence of probable cause in any particular case is a question of law." *St. John v. Justmann*, 771 F.2d 445, 447 (10th Cir. 1985). Determination whether probable cause supported the arrest and continued confinement of Coones for the malicious prosecution case, involves undertakes a five-step inquiry:

> First, the court determines if there is a question of fact as to whether particular items of evidence were fabricated; second, the court eliminates those items from consideration in its probable cause analysis; third, the court determines whether exculpatory evidence was improperly excluded from consideration; fourth, the court includes any such evidence in its analysis; fifth, the court determines whether probable cause still exists after factoring in all excisions and additions.

---

[3] Coones wife, Dierde, told detectives that "this" (Kathlen's death) "may not have happened" if the police had arrested Kathleen 2 years earlier (for the suspected elder abuse of Coones, Sr. Appx.II, 380.

*Miller v. Arbogast*, 445 Fed.Appx.I16, 119–20 (10th Cir. 2011).

Neither plaintiff nor the district court discounted any of the above-listed bases for probable cause. The district court noted that Plaintiff contends Michael withheld and fabricated evidence, which if presented before trial would have obviated probable cause. Specifically, plaintiff and the district court pointed to (1) Michael's testimony that he did not see Coones' van at house on the morning of April 7;[4] (2) that fact Michael or Garrison viewed the QuikTrip surveillance video and did not see Kathleen or Coones on it during the time in question on April 5; and (3) with the information from Thad Jones about Kathleen's embezzlement. Appx.XIV, 3836. The district court concluded "Plaintiff has met her burden of showing that the State lacked arguable probable cause for Coones' prosecution when disregarding Michael's statement about the van and when considering the QuikTrip evidence, the embezzlement evidence, and the KBI report." *Id.* Taking these in order:

Plaintiff takes 1+1+1 and derives a sum of 10. Michael did not testify the van was not at Coones' house. Rather, his testimony was clear that the van could not be seen from his vantage point and he admitted the van could be parked behind the

---

[4] Michael did not testify that Coones' van was not at the house as suggested by the district court's decision. Appx.XIV, 3836 ("Michael's testimony that the van was not at Mr. Coones' house"). Rather, Michael testified he walked up and saw two vehicles parked next to the house, neither were Coones' van. *Id.*, 579. Michael also testified that Coones said the van had been parked "way around behind the house, to hide it from creditor" and that he [Michael] would have been unable to see the van if it were parked on the west end behind the house. *Id.,* 589.

{460004}

house without him being able to see it. Coones' alibi witnesses said the van was parked at the house. The location of the van, whether it was at the house at 6:00 a.m. or not, does not obviate the probable cause articulated above.

The QuikTrip did not show either Kathleen or Pete Coones. When including the fact QuikTrip video did not corroborate the statement that Pete confronted Kathleen at the QuikTrip does not obviate the probable cause articulated above.

Likewise, when the information from Thad Jones about Kathleen's embezzlement is considered as part of the probable cause analysis, it does not obviate the probable cause articulated above.

The district court also included the KBI examiner's check forgery report in its probable cause analysis as to Michael and Garrison. Appx.XIV, 3836. That report, however, was not known to Michael or Garrison. The report had been placed in Block's placed personal file. *Id*., 3815. Nonetheless, if the check forgery report were considered as part of the probable cause analysis, it does not obviate the probable cause articulated above. Quite the opposite—the probable cause included Pete's admitted animosity towards Kathleen for taking the assets of Coones, Sr. The forgery report emphasizes the basis for that animosity and does not obviate probable cause.

There is no evidence that Michael or Garrison knowingly omitted facts or acted with reckless disregard for the truth. Both detectives are entitled to judgment. *Meacham*, 82 F.3d 1560-63 (officer did not violate the Fourth Amendment where

51

plaintiff failed to provide any evidence showing the officer omitted any facts knowingly or with reckless disregard for the truth). There was probable cause for Coones' arrest, charge, trial and conviction. As a matter of law, the evidence relied upon by plaintiff and the district court does not obviate probable cause. Accordingly, Both Michael and Garrison are entitled to judgment on the malicious prosecution claim.

Moreover, Garrison is particularly entitled to judgment as she did not write the report or the probable cause affidavit, she did not testify at the preliminary hearing and she did not testify at either trial.

## IV.    Alternatively Michael and Garrison are entitled to qualified immunity as no clearly established law places the question beyond debate,

The second prong of the qualified immunity analysis places the burden on Plaintiff to show that the law was clearly established at the time of the alleged violation. *Soza v. Demsich*, 13 F.4th 1094, 1099 (10th Cir. 2021). As discussed above, no decision by the United States Supreme Court or Tenth Circuit clearly establishes a due process violation absent intentional misconduct.

The Supreme Court emphasizes the importance of the qualified immunity analysis because qualified immunity is important to society as a whole and, as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial. Clearly established law ought not be defined at a high level of generality but, rather, must be particularized to the facts of the case. *White v.*

{460004}

*Pauly*, 580 U.S. 73, 79 (2017).

When asserting the qualified immunity defense a defendant triggers the "well-settled twofold burden [plaintiff is] compelled to shoulder: not only must plaintiff rebut defendant's no-constitutional-violation arguments, but [he] also had to demonstrate that any constitutional violation was grounded in then-extant clearly established law." *Cox v. Glanz*, 800 F.3d 1231, 1245 (10th Cir. 2015). "Clearly established law," as *White v. Pauly* reminds, must involve "a case where an officer acting under similar circumstances as [defendant] was held to have violated the Fourth Amendment." 480 U.S. at 80. Further, that law must be a "Supreme Court or Tenth Circuit decision on point or the clear weight of authority from other jurisdictions." *Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir. 1992).

The issue on qualified immunity is whether "every" reasonable officer would have, under the same or very similar circumstances, understood their failure would violate a suspect's rights to due process. *al-Kidd*, 563 U.S. at 741.

With respect to the due process/*Brady* claims, *Daniels v. Williams* provides that no constitutional deprivation occurs on account of official negligence. 474 U.S. 327, 330–33 (1986). Negligence or inadvertence in failing to turn over evidence cannot be actionable under § 1983. *Jean*, 221 F.3d at 660. Neither the Supreme Court nor the Tenth Circuit has imposed such a sweeping duty on police under *Brady* on

the facts shown. Liability under § 1983 in the absence of a showing of bad faith on the part of the police does not constitute a denial of due process of law, 488 U.S. at 58, any holding otherwise is not clearly established and both Michael and Garrison are entitled to qualified immunity.

As to the malicious prosecution claim, the question for qualified immunity is whether the actual facts extant in the case give rise to arguable probable cause. *See Bailey v. Twomey*, 791 Fed.Appx. 724, 731 (10th Cir. 2019); *Cortez*, 478 F.3d at 1120. The answer to that question does not depend on what the defendants subjectively knew or believed; rather, it is an objective inquiry of whether "a reasonable officer" in the defendants' position "could have believed that probable cause existed." *Culver v. Armstrong*, 832 F.3d 1213, 1218 (10th Cir. 2016) (quoting *Stonecipher*, 759 F.3d at 1141.

> [W]e ascertain whether a defendant violated clearly established law by asking whether there was 'arguable probable cause' for the challenged conduct. Arguable probable cause is another way of saying that the officers' conclusions rest on an *objectively reasonable*, even if mistaken, belief that probable cause exists. A defendant is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff.

*Id.* at 1141 (emphasis added) (citations and quotations omitted). "Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Id.* The facts and circumstances confronted by Michael and Garrison, at a minimum, gave rise to

arguable probable cause—*i.e.*, an objectively reasonable belief even if mistaken. As such both are entitled to qualified immunity.

## IV.    The Unified Government is also entitled to judgment on Counts I and II.

This court has pendant jurisdiction over an interlocutory appeal if, and only if, an otherwise nonappealable decision is inextricably intertwined with the appealable decision or where review of the nonappealable decision is necessary to ensure meaningful review of the appealable decision. *Timpanogos Tribe v. Conway*, 286 F.3d 1195, 1200 (10th Cir. 2002). The former, inextricably intertwined, applies to the appeal by the Unified Government. The requirement that the decision be inextricably intertwined requires that the pendent claim must be coterminous with, or subsumed with the claim properly before the court. *Lee v. Nicholl*, 197 F.3d 1291, 1297 (10th Cir. 1999). Pendent appellate jurisdiction will not lie if the appeal for the individual defendants turns on the "clearly established" prong of the qualified immunity analysis. *Ragsdell v. Reg'l Hous. All. of La Plata Cnty.*, 603 Fed.Appx. 653, 657 (10th Cir. 2015). If, on the other hand, it addresses the underlying constitutionality of the individuals' actions then pendent appellate jurisdiction is proper.

> [A] pendent appellate claim can be regarded as inextricably intertwined with a properly reviewable claim on collateral appeal only if the pendent claim is coterminous with, or subsumed in, the claim before the court on interlocutory appeal—that is, when the appellate resolution of the collateral appeal necessarily resolves the pendent claim as well.

*Moore v. City of Wynnewood*, 57 F.3d 924, 930 (10th Cir. 1995). *If* the court holds the defendant officers' conduct did not violate the plaintiff's constitutional right and that holding would resolve any issue presented by the appeal by the municipality, pendent jurisdiction exists. *Lynch v. Barrett*, 703 F.3d 1153, 1163–64 (10th Cir. 2013) (noting pendent jurisdiction appropriate where claim against the municipality is premised on claim the defendant officer committed constitutional violation).

Provided the Court finds, as argued above, that neither Michael nor Garrison violated Coones' constitutional rights, then judgment for the Unified Government is also appropriate as there is no basis for *Monell* liability where there is no underlying constitutional violation.

## Conclusion

Appellants pray that this Court finds:

(1)  Michael and Garrison did not violate Coones' constitutional rights by withholding exculpatory evidence intentionally or in bad faith and that the *Monell* claim against the Unified Government be dismissed on that basis, or in the alternative, that right was not clearly established and Michael and Garrison are entitled to qualified immunity;

(2)  Michael and Garrison did not violate Coones' constitutional rights by fabricating evidence about the van's location and that the *Monell* claim against the Unified Government be dismissed on that basis, or in the alternative, that Garrison did not violate Coones' constitutional rights by fabricating evidence and dismissing that claim against her;

(3)  Probable cause supported the arrest, charge, continued detention, prosecution, conviction, and sentence of Coones' and that Michael and Garrison and the Unified Government are entitled judgment on the malicious prosecution claim, or in the alternative, that arguable probable cause existed and that Michael and Garrison are entitled to qualified immunity.

{460004}

## Statement of Counsel as to Oral Argument

Appellants request oral argument under Fed. R. App. 34(a)(1) because it will

assist the Court in reviewing this important civil rights suit.

Respectfully submitted,

**s/David R. Cooper**

David R. Cooper                    KS #16690

Charles E. Branson               KS #17376

Fisher, Patterson, Sayler & Smith, LLP

3550 SW 5th Street

Topeka, Kansas 66606

Office: 785-232-7761 | Fax: 785-232-6604

dcooper@fpsslaw.com | cbranson@fpsslaw.com

Attorneys for Defendants/Appellees

{460004}

**Certificate of Compliance with Type-Volume Limit**

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 12,895 words, counted using Microsoft 365.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Times New Roman 14-point font.

**s/David R. Cooper**
David R. Cooper                    KS #16690

**Certificate of Service**

The undersigned hereby certifies that on February 6, 2025. I caused the foregoing corrected brief to be electronically filed with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

Joshua L. Loevy, Jonathan Loevy, Russell Ainsworth, Locke Bowman, Wally Hilke
LOEVY & LOEVY
311 N. Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
Tel: (312) 243-5900 | Fax: (312) 249-5902
joshl@loevy.com | jon@loevy.com | russell@loevy.com |locke@loevy.com | hilke@loevy.com

Brandon A. Bell, Lindsay Runnels
MORGAN PILATE, LLC
926 Cherry Street
Kansas City, Missouri 64106
Tel: (816) 471-6694 | Fax: (816) 472-3516
bbell@morganpilate.com | lrunnels@morganpilate.com
**Attorneys for Plaintiff/Appellee**

**s/David R. Cooper**
David R. Cooper                    KS #16690

{460004}

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

DEIRDRE COONES, Executor of the Estate of
Olin Coones,

      Plaintiff,

      v.

UNIFIED GOVERNMENT OF WYANDOTTE
COUNTY/KANSAS CITY, KANSAS BOARD
OF COUNTY COMMISSIONERS, et al.,

      Defendants.

Case No. 22-CV-2447-JAR

### MEMORANDUM AND ORDER

Plaintiff Deirdre Coones, as Executor of the Estate of Olin Coones, brings this action
asserting federal civil rights claims and state law tort claims against Defendants Board Of
County Commissioners of the Unified Government of Wyandotte County and Kansas City,
Kansas ("Board"); Unified Government of Wyandotte County and Kansas City, Kansas
("Unified Government"); William Michael; Angela Garrison; Sergeant G. Dorsett; Bryan Block;
Susan Brown; and Detective Sanchez. Plaintiff's claims arise out of her deceased husband, Olin
Coones' wrongful conviction for murder.

Plaintiff alleges the following claims for relief under 42 U.S.C. § 1983 against
Defendants in their individual and official capacities: (1) Count I—Due Process Violation based
on fabricating and suppressing evidence; (2) Count II—Malicious Prosecution and Unlawful
Pretrial Detention; (3) Count III—Failure to Intervene; and (4) Count IV—Conspiracy. Plaintiff
alleges the following claims under Kansas law: (1) Count V—Indemnification; (2) Count VI—
Malicious Prosecution; (3) Count VII—Intentional or Reckless Infliction of Emotional Distress;

(4) Count VIII—Negligent Infliction of Emotional Distress; (5) Count IX—Civil Conspiracy;

and (6) Count X—respondeat superior liability against the Board and the Unified Government.

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc.

101).[1] The motion has been fully briefed, and the Court is prepared to rule. Plaintiff's response

to the summary judgment motion concedes that all claims can be dismissed against Defendants

Dorsett and Sanchez, that her malicious prosecution claims against Defendants Block and Brown

(Counts II and VI) can be dismissed, and that her negligent infliction of emotional distress claim

can be dismissed in its entirety (Count VIII). Thus, these parties and claims are hereby

dismissed. As described in more detail below, the Court grants in part and denies in part

Defendants' motion for summary judgment on the remaining claims.

## I.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no

genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[2] In

applying this standard, the court views the evidence and all reasonable inferences therefrom in

the light most favorable to the nonmoving party.[3] "There is no genuine issue of material fact

unless the evidence, construed in the light most favorable to the nonmoving party, is such that a

reasonable jury could return a verdict for the nonmoving party."[4] A fact is "material" if, under

the applicable substantive law, it is "essential to the proper disposition of the claim."[5] An issue

---

[1] The Court will issue a separate ruling on Defendants' pending Motion to Exclude Testimony from Balash, Harvey, and Roe (Doc. 102). This Memorandum and Order does not rely upon the findings of these experts.

[2] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[3] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[4] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[5] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[6]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[7]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[8]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[9]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[10]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[11]  The facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[12]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of

---

[6] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[7] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[8] *Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[9] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[10] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[11] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[12] *Adams*, 233 F.3d at 1246.

every action."[13]

## II.   Facts

Determining the uncontroverted facts in this matter was more difficult than necessary. Neither party specifically controverted statements of fact in separately numbered paragraphs as required by Fed. R. Civ. P. 56(c)(1) and D. Kan. Rule 56.1.  Defendants' opening brief was in compliance.  In the response, Plaintiff presented her own statements of fact and then, in some instances, indicated which of Defendants' paragraphs each of her own purportedly controverts. In the reply, Defendants responded to only some of Plaintiff's statements of fact, and provided lengthy narrative statements of their own versions of the facts, rather than succinctly pointing out each dispute.

The Court has credited the parties' specific references to statements of fact in the response and reply to determine what is truly controverted, but to the extent Plaintiff failed to specifically reference Defendants' statements of fact by paragraph number, and such facts are material to the issues before the Court and supported by the record, the Court deems them uncontroverted.[14]  Similarly, to the extent Defendants do not directly controvert Plaintiff's additional statements of fact, beyond simply narrating their own version of the same facts, the Court deems those facts either uncontroverted or views them in the light most favorable to Plaintiff.[15]

---

[13] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[14] *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").

[15] *See* D. Kan. R. 56.1(b)(2), (c) ("All material facts set forth [in the non-moving party's statement of additional material facts] will be deemed admitted for the purpose of summary judgment unless specifically controverted.").

3800

Additionally, the Court sustains evidentiary objections to evidence offered through affidavits and deposition testimony that would not be admissible at trial, including evidence that is not relevant,[16] and evidence that is not based on the witness's personal knowledge.[17] The Court disregards legal arguments and conclusions, "statements of mere belief,"[18] and conclusory allegations without specific supporting facts.[19] The Court will not separately address each and every objection raised by the parties, although it notes some specific rulings where necessary throughout this opinion.

With this guidance in mind, the following material facts are either uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff.

In April 2008, Olin "Pete" Coones ("Mr. Coones"), a retired mail carrier, was 50 years old and living with his wife, Plaintiff Deirdre Coones, at 640 South 81st Street, in Kansas City, Kansas.

In 2000, Mr. Coones' grandfather, Olin Coones ("Senior"), and his mother, Patsy Van Vleck ("Patsy"), lived in a house they owned together on Parallel Parkway. At some point before 2004, Kathleen Schroll ("Kathleen") began working as a housekeeper for Patsy and Senior at the Parallel Parkway house. On January 15, 2007, Senior died. Kathleen and Mr. Coones litigated against one another regarding Senior's life insurance proceeds. Kathleen told her daughter, Blair Hadley ("Blair"), that the lawsuit with Mr. Coones was over $182,000.

---

[16] Fed. R. Evid. 401.

[17] Fed. R. Evid. 602.

[18] *Argo v. Blue Cross Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006) (quoting *Tavery v. United States*, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)).

[19] *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1143 (10th Cir. 2005) (citations omitted).

*April 7, 2008 Investigation*

On April 7, 2008, at approximately 2:20 a.m., Kathleen called her mother, Elizabeth Horton ("Elizabeth"), and told her "Pete" was there trying to kill her husband, Carl Schroll ("Carl"), that he said he was going to kill her, and that he had covered his tracks so they would not know it was him. The line then went dead. Elizabeth relayed the information to her son Randy Horton ("Randy"), who lived with her. Randy called 911 at 2:23 a.m. and reported that Mr. Coones was at 47 South 78th Street, the Schrolls' address, trying to kill his sister and her husband.

Kansas City, Kansas Police Officers Sophia Barajas and P. McCallop responded to Kathleen's house at 47 South 78th Street on the morning of April 7, 2008, and found that the screen door was shut but the interior door was open about three or four inches. The officers found Kathleen's body lying face-up in the living room with a silver revolver near her left foot and a cordless phone near her right foot. She sustained a single gunshot to the back of her head. Kathleen was dressed in nurse's scrubs and with jewelry and her glasses on when she was found; her purse was sitting open on the back of her living-room couch. The officers found Carl's body in a bedroom, sprawled across the bed with gunshot wounds to his left chest and left abdomen, and an injury to his head. There were no signs of forced entry or a struggle.

Field Supervisor Greg Dorsett, after learning that Officers Barajas and McCallop found the Schrolls' bodies, went to the scene. Detective Stuart Littlefield responded to the scene at about 3:00 a.m. Detectives William Michael and Angela Garrison, the lead detectives on the case, were called out to the scene at approximately 3:15 a.m.

Elizabeth and Randy eventually arrived at the crime scene. Elizabeth told Officer Barajas that the suspect's name was Pete Coones, and that Kathleen had called her hysterical at 2:18 a.m.

and told her, "He's getting us.  He's trying to kill Carl and said he's going to get me, and he said he gots his tracks covered where they're not going to find out it's him."[20]

Detective Littlefield and Deputy District Attorney ("Deputy D.A.") Edmond Brancart secured a search warrant for the crime scene.  Detective Littlefield returned to the scene with the search warrant and assisted the Crime Scene Investigation Unit ("CSIU") in processing the house for evidence while Detectives Michael and Garrison interviewed witnesses.  Sergeant Dorsett radioed to dispatch and reported that the deaths appeared to be a "possible murder-suicide."  Officer Harper took a video of the crime scene.

Detectives Michael and Garrison took Elizabeth's recorded statement.  Among other things, Elizabeth told them (1) about Kathleen's phone call before the murder; (2) that "Pete" was Pete Coones; (3) that Kathleen had been a caregiver to Pete's father; (4) that there was a life insurance policy "tied up in court" that Mr. Coones was contesting; (5) that Mr. Coones harassed Kathleen since he found out he was not the beneficiary of Senior's estate and insurance policies; (6) that Kathleen had made police reports concerning burglaries of the house she inherited from Senior and that Kathleen believed Mr. Coones was the suspect; and (7) that Kathleen had filed numerous police reports against Mr. Coones for stalking and harassment.

While Detective Garrison considered the possibility of a murder-suicide while en route to the scene, once she arrived and saw Kathleen's body, and then learned of the phone call Kathleen made to Elizabeth, she believed Kathleen was murdered.  Detective Michael testified in his deposition that he did not try to discount a murder-suicide theory and that he believed he was dealing with a double-murder.  Detective Michael also testified that if he was investigating a

---

[20] Doc. 101-2 at 16.  Plaintiff asserts that Elizabeth reported she did not hear any sounds in the background during this call.  However, Plaintiff's citation to Detective Michael's deposition testimony is to a page number not included in the record, so the Court disregards this statement of fact.  *See* Doc. 106 ¶ 56 (citing Ex. 1 (Michael Dep.) at 186:5–22, attached as Doc. 106-2).

potential suicide, he would look at reasons why a person might kill themselves, including financial trouble or imminent criminal prosecution.

Detective Michael's investigative report indicates that the detectives next asked Kathleen's brother, Scott Horton ("Scott"), to accompany them to Mr. Coones' home. Scott told them that Mr. Coones drove a brown van. They stopped halfway down the street, which was a cul de sac, and Detective Michael walked down to the address Scott gave them. Detective Michael ran the vehicle tags for the only two vehicles he saw in the driveway, but neither was registered to Mr. Coones. He could not see all the way around to the west side of the house. Seeing no brown van at the residence, they left and returned to the crime scene. He did not document or photograph his vantage point, despite admitting later that he should have done so.

At approximately 6:35 a.m., the detectives took Blair's recorded statement. Blair reported that Kathleen told her Mr. Coones had threatened Kathleen at a QuikTrip gas station after work on April 5, 2008, when Kathleen was walking out and Mr. Coones was walking in. According to Blair, Mr. Coones was driving "the van," and told Kathleen: "You're not going to be spending my dad's money no more, bitch."[21] Detectives Michael and Garrison reviewed the QuikTrip surveillance video and determined that neither Mr. Coones nor Kathleen were shown on video. The detectives did not document that they went to the QuikTrip, that they reviewed the surveillance footage, or that the footage did not show either Kathleen or Mr. Coones at the relevant date and time. Nor did the detectives inventory the surveillance video. This evidence should have been documented under their normal practice.

Detective Michael's report does not indicate that Blair told the detectives that the Schrolls were having marital tension. But the report does state that Blair told them that Kathleen

---

[21] Doc. 101-2 at 40.

said her gun was "Pat's gun."  According to Kansas City, Kansas Police Department ("KCKPD")

reports, Patsy had reported her gun stolen on February 23, 2000.

### *Mr. Coones' Arrest*

Later that morning, police received information that Mr. Coones was in his brown van,

preparing to leave his house on 81st and Kansas Avenue.  Detectives Michael, Garrison, and

Dorsett drove to the house and arrested Mr. Coones around 7:00 am on April 7, 2008.

Detectives Michael and Garrison interviewed Mr. Coones' children, Melody and Ben

Coones.  Melody told them that her dad was downstairs when she went to sleep the night before.

She did not know if her father left the house between 12:30 a.m. and 6:30 a.m. when she was

asleep.  Similarly, Ben said that his father was downstairs when he went to bed at 11:30 pm and

was home when he woke up at 6:30 a.m.  They both told the detectives that their father was

involved in a legal dispute with Kathleen over about $100,000, and that Kathleen had forged

checks on Senior's bank account.  Ben told detectives that his father's brown van had been

parked at their home and that it would have been visible from the front of the house, but not from

the street.

Detectives interviewed Mr. Coones at about 10:00 a.m. that morning after reading him

his *Miranda* rights.  Mr. Coones first provided details about his lawsuit against Kathleen.  He

told them that Detectives Block and Brown had investigated the alleged theft or forgery by

Kathleen on Senior's bank account.  He told the detectives that Kathleen lived directly across the

street from the school his children attended, and identified for the detectives the lawyers

involved in the civil matter.  Mr. Coones denied that there was any confrontation on April 5,

2008 at the QuikTrip, and told the detectives he had been home from 11:15 p.m. on April 6 until

he left to take his children to the bus stop that next morning, at which time he was arrested.  Mr.

Coones said that his van had been parked behind the house to hide it in order to avoid repossession. Mr. Coones told the detectives he had never been inside the Schrolls' house, that "it wasn't me," and "prove it."[22] He also told investigators to keep investigating. Mr. Coones then requested an attorney and the interview terminated.

Next, the detectives took Melody and Ben home and interviewed Mr. Coones' wife, Plaintiff Deirdre Coones. Plaintiff told them that Mr. Coones went to bed at about 11:30 p.m., and was home when her alarm went off at 6:15 a.m. She told the detectives that Mr. Coones' van was parked in the back that night and could not be accessed without moving her daughter's boyfriend's van.

At 9:34 a.m. on April 7, Deputy D.A. Brancart emailed Detective Garrison information about a prior investigation involving Mr. Coones, Senior, and Kathleen. Detective Bryan Block, who worked in financial crimes, investigated Kathleen based on allegations by Senior and Mr. Coones of elder abuse before Senior's death. Deputy D.A. Brancart relayed that Kathleen had been taking care of Senior, and that "[s]he used his credit to buy QVC purses and women's shoes. She paid some of her own bills. She wrote a check to herself from [Senior] for her birthday, for something like $1,000. She converted [Senior's] Jeep over to her own ownership."[23] Deputy D.A. Brancart told Detective Garrison that Mr. Coones and Senior had consulted with him about the suspected elder abuse before Senior's death. Deputy D.A. Brancart advised that the last information he had was that Detective Block was looking at her bank records. The case reports from the elder abuse investigation were included in the investigative

---

[22] Doc. 106-8 at 8.

[23] Doc. 101-39.

file for the Schroll death investigation, including property reports logging 120 pages of checks and exemplars of Senior's signatures.

After Mr. Coones' arrest, police searched his home pursuant to a search warrant. The search of Mr. Coones' home did not reveal any bloody clothing, firearms, or ammunition. Officer Stanley Isaacson and Detective Michael searched Mr. Coones' van for fingerprints, bullets, DNA, blood, and tissue. Officer Isaacson swabbed the van's steering wheel for gunshot residue ("GSR"). Officer William Barajas swabbed Carl's and Kathleen's hands for gunshot residue. According to the investigative report, this was a "binary" GSR kit.[24]

CSI Officer Harper swabbed the silver revolver for DNA. Only Kathleen's DNA was found on the revolver—on both the barrel and the trigger. No DNA or fingerprint evidence from Mr. Coones was found at the Schrolls' house following their deaths.

It was the detectives' job to ensure that the evidence collected was tested by the crime lab. Detective Michael testified at his deposition that, as a homicide detective, he would be expected to either know what testing was possible, or find out by asking someone in the CSIU. But Detective Garrison testified at her deposition that while the detectives may have determined whether the lab tests were to stay "in house" or go to a Kansas Bureau of Investigation ("KBI") crime lab, she has never actually sent a GSR test to the KBI. According to the investigative file, the CSIU put the GSR test kit "in property."[25]

---

[24] Doc. 101-2 at 96.

[25] *Id.* at 92. The Court is mindful that Defendants cited to an affidavit in the reply brief from Harold C. Riddle, a forensic scientist with the KBI, who states that the KBI did not have the ability to test Primer Gunshot Residue ("pGSR"), or accept pGSR samples from law enforcement agencies until 2017. Doc. 101-29. Plaintiff submitted a surreply stating that this witness's testimony would be inadmissible at trial because he was not previously disclosed. But Plaintiff fails to address the applicable test in Fed. R. Civ. P. 37(c), and the Court declines to do so sua sponte. Because the failure to test the GSR properly is not relied on by Plaintiff, standing alone, to support her claims on summary judgment, the Court need not resolve the issue at this time.

*Continued Investigation*

On April 8, detectives executed a search warrant to collect oral swabs from Mr. Coones for DNA testing. Two swabs were collected, placed in evidence, and eventually forwarded to the KBI laboratory. The detectives also learned that the Taurus .38 caliber silver revolver found at the crime scene was originally purchased by Senior's daughter, Patsy, which Patsy had reported stolen in 2000.

Also on April 8, Forensic Pathologist Erik Mitchell, M.D. performed autopsies on Carl's and Kathleen's bodies in Topeka, Kansas. Dr. Mitchell's autopsy report for Carl indicates that he died as a result of two gunshot wounds. Before the autopsies, Dr. Mitchell was told that the decedents were found dead of gunshot wounds after a call had been placed by the female decedent "to a daughter, indicating there was an assault."[26] Dr. Mitchell did not receive any other information from the KCKPD about the circumstances of the Schrolls' deaths, and he did not request any additional information before he performed his autopsy. He determined that Kathleen died as a result of "a penetrating gunshot wound to the head that would immediately incapacitate voluntary function."[27] Dr. Mitchell concluded that both Carl and Kathleen's manner of death was homicide. Detective Block attended the autopsies, and noted in his report, *inter alia*, that "[t]here was blood on her face, her scrubs, and the outside of her glasses . . . [and] [t]here was a small amount of blood spatter on [Kathleen's] left hand."[28]

Detectives Michael and Garrison executed an arrest affidavit for Mr. Coones. Assistant D.A. Victoria Meyer executed an information charging Mr. Coones with the murder of Kathleen and Carl Schroll. An amended information was filed two days later.

---

[26] Doc. 101-27 at 2.

[27] Doc. 101-2 at 1.

[28] Doc. 106-5 at 2.

On April 9, Detectives Garrison and Michael conducted another interview with Blair and showed her a photo lineup. Blair identified Mr. Coones from the lineup. She also told the detectives that Kathleen kept a handgun. Detectives then spoke to Kathleen's brother, Randy. He told them about the phone call Elizabeth received the morning of April 7 from Kathleen, that Kathleen had inherited the house on Parallel Parkway that was part of the challenge stemming from "Pete," and that he was aware of the lawsuit between Kathleen and Mr. Coones over Senior's insurance policy.

On April 14, the detectives took another recorded statement from Elizabeth. She told them that Kathleen kept a pistol in her purse. Elizabeth had never seen the pistol, but Kathleen told her she carried one for work and for protection. She told them that Kathleen often carried large sums of money from the credit union where she worked and made deposits at another location. Finally, Elizabeth told detectives that Kathleen told her Mr. Coones had broken into the garage of the Parallel Parkway house and stole a Dixon riding lawnmower, but Elizabeth was unsure of the date.

The detectives attempted to follow up and gather information about the stolen lawnmower, but could not corroborate the alleged theft. When police searched Mr. Coones' home after his arrest, they did not find the lawnmower that Kathleen claimed Mr. Coones had stolen.

On April 14, 2008, when Detectives Michael and Garrison interviewed Kathleen's supervisor at Midwest Regional Credit Union, Thad Jones, he confirmed that Kathleen owned a handgun but said he had never seen it. He told the detectives that Kathleen was not required to transport money for her job.

Kathleen told Elizabeth, Blair, and Randy that she had made several police reports about Mr. Coones stalking her. Kathleen told Blair that she called the police many times to report Mr. Coones for harassment, but the KCKPD had no records of any complaints by Kathleen that Mr. Coones was harassing or stalking her. Randy told detectives that Kathleen said she had a restraining order against Mr. Coones, but the KCKPD has no record that Kathleen ever obtained a restraining order against him. Detective Michael also learned that Senior had not, in fact, left an inheritance to Kathleen, as she had told her mother. Detective Michael now admits that these inconsistencies would have been a "red flag" to Detective Michael that Kathleen was not honest.

On April 15, Detectives Michael and Garrison secured a search warrant and, along with CSI Officer Jaskinia, collected additional evidence from the crime scene. They took photographs, and measurements for blood splatter. At some point, investigators learned that both Mr. Coones and Kathleen were left-handed.

### Preliminary Hearing

A preliminary hearing was conducted on June 27, 2008, in Wyandotte County District Court. The autopsy reports were admitted as evidence and, before rendering its decision, the court recessed to review the report.

Detective Michael testified about his interview with Mr. Coones after the arrest, and that Mr. Coones told him that his brown van was parked behind his house during the early morning hours of April 7, 2008. Detective Michael then testified that he confronted him about whether his brown van was in fact at his house all night:

> I explained to him that, once I received information as far as who he was and where he lived, that I personally went to that residence and I didn't see his vehicle. He told me that he has his vehicle parked way around behind the house, to hide it from creditors that he owned [sic] money to. He feared that his vehicle may be repossessed. And I told him that when I went up to his house to try

> to find his vehicle, I didn't see it. I walked to the east side of his
> house, which would give me a view to the back yard. I—I— I will
> admit, if—if if there was anything that would have indicated that
> the vehicle was on the extreme west end of the house, I would not
> have been able to see it; but we subsequently served a search
> warrant at that house, and I did see some tire marks. I went back
> up to the area where I initially began my walk-up; and if the van
> would have been anywhere near those tire marks, I—I would have
> seen it, regardless of the lighting conditions.[29]

Based on this testimony, the prosecutor argued that Mr. Coones gave police "an account of his

whereabouts that are inconsistent with the facts the police knew."[30]  The court found probable

cause and bound Mr. Coones over for trial on both murder charges.

Three days after the preliminary hearing, on June 30, 2008, Deputy D.A. Brancart sent

the following email to Detectives Michael and Garrison:

> I see that Stan Isaacson did a gunshot residue test on the steering
> wheel of the Chevrolet van. I also see that William Barajas did a
> gunshot residue test on both Carl and Kathleen's bodies.
>
> I don't know anything about the tests that were performed. School
> me. Not only in name of the test, method it works—but also in
> results. Is this something to be taken to the lab?
>
> I need to know how to talk about these tests, and how to put on
> evidence in the trial.[31]

Detective Garrison quickly responded to Brancart, "I'll find out."[32]

### Trial

The case was tried to a jury on January 20–23, 2009. The jury returned a verdict of guilty

for the first degree, premeditated murder of Kathleen Schroll, and not guilty for the first degree,

---

[29] Doc. 101-6 at 50:1–22.

[30] *Id.* at 65:6–8.

[31] Doc. 106-14.

[32] Id.

premeditated murder of Carl Schroll.  But the trial court ordered a new trial because the State failed to timely disclose a forensic examination report of Mr. Coones' computer.  Mr. Coones was retried on December 14–17, 2009.  He was again convicted of the first degree, premeditated murder of Kathleen.  Mr. Coones was sentenced to serve at least fifty years in prison before becoming eligible for parole.

Patricia Kalb was Mr. Coones' defense attorney at trial.  She spoke to Detective Michael before trial about the encounter at QuikTrip that Blair had relayed to the detectives.  He told Kalb that he "investigated it and could not find the video."[33]

Before trial, the State filed a motion in limine to exclude certain hearsay statements made by Kathleen to Blair.  In the motion, the State proffered Blair's testimony about the QuikTrip confrontation, including that Kathleen said that she and Carl had been experiencing marital tension the weekend before the murder.  Blair was expected to testify that Kathleen told her she had not told Carl about the QuikTrip incident due to these marital tensions.  Nonetheless, Blair was not asked about marital tension and the issue was not otherwise raised at trial.  She did testify about the confrontation at QuikTrip; that Kathleen told her it occurred the Saturday before her death when Kathleen was going into the store and Mr. Coones was coming out.

No testimony or evidence about GSR testing was offered at the trial or retrial.

Detective Michael testified at both trials about the brown van consistent with his testimony at the preliminary hearing—that he personally went to the Coones' residence after the murder, that he did not see the brown van there, and that he would have seen it if it based on where the tire ruts were located when he viewed the backyard on the morning of April 7, 2008.

---

[33] Doc. 106-12 at 145:11–17.

Before Detective Michael testified at trial, he would go over the questions he would be asked with the prosecutor, without fail.

Ross Minks, who was Mr. Coones' daughter's boyfriend, testified as an alibi witness at both trials because he was staying at the Coones' house on the night of April 6, 2008. He testified at the first trial that Mr. Coones went to bed that night at about 11:15 p.m., after which he and Mr. Coones' daughter watched a movie; he was awake that night until 2:30 or 3:00 a.m. He testified that every night he was there, Mr. Coones would park his van "at the back garage, and I would always pull my van up along the side of the house."[34] Minks testified that he saw Mr. Coones exit his bedroom to use the bathroom at around 2:00 a.m., and that Minks heard Mr. Coones using his computer until Minks fell asleep. He testified that Mr. Coones would have had to pass in front of him watching the movie to leave the house. At about 6:00 a.m., Mr. Coones woke up Minks to obtain his keys so that Mr. Coones could access his van.

Minks testified that he and Mr. Coones' daughter were supposed to go talk to the police about a week after the murders, but on the advice of Mr. Coones' counsel, they did not. At the retrial, Minks testified that he tried to talk to an officer when they were searching Mr. Coones' house, and that he tried to talk to two detectives. He said that he "made several attempts to talk to them," and that he called them because he "knew where Mr. Coones was the whole entire time up until I went to sleep."[35] Detective Michael does not recall taking a statement from Minks, or having him prepare a statement.

At the retrial, Detective Block testified that Kathleen had drained Senior's bank account while he was in her care.

---

[34] Doc. 101-10 at 104:2–5.

[35] Doc. 101-15 at 209:2–3.

At the retrial, Kalb introduced evidence and argued that Kathleen committed suicide. The prosecutor argued in closing that "Kathleen did not put a gun in her mouth. She did not put a gun to her temple. No evidence suggests that she would have any motivation other than to do anything to live and keep on living."[36]

### *Evidence Discovered After Trial*

- ### *Embezzlement*

In 2008, Kathleen worked at Midwest Regional Credit Union processing checks deposited there so that they could be transmitted to the Federal Reserve. Jones, Vice President of Accounting and Technology, was her direct supervisor. When Kathleen did not show up for work on April 7, the day she died, Jones discovered an irregularity in her accounts and opened an investigation. Jones discovered that Kathleen had been submitting checks for payment by the credit union that were supposed to be drawn against other banks once they were submitted to the Federal Reserve. She embezzled over $11,000 from the credit union before her scheme was uncovered. On April 9, 2008, Jones wrote a Suspicious Activity Report documenting his findings regarding Kathleen's embezzlement.

Detectives Michael and Garrison interviewed Jones on April 14, 2008. He told the detectives that he had discovered Kathleen's embezzlement and provided them with a copy of the Suspicious Activity Report.[37] The detectives should have made a record of this evidence but

---

[36] Doc. 101-16 at 13:1–5.

[37] The Court acknowledges that the parties dispute whether Jones' testimony in 2020 at the § 60-1507 hearing, or his 2023 deposition in this case should be credited on this issue—whether he in fact remembers telling detectives about the embezzlement and showing them the report. Similarly, the parties dispute whether Detective Michael's testimony at the § 60-1507 hearing that Jones told him about the embezzlement should be credited, instead of his deposition testimony in this case where he walked that back. At summary judgment, the Court must view this evidence in the light most favorable to Plaintiff. Under this standard, without weighing Jones' or the detectives' credibility, the Court must credit Jones' 2020 testimony that he recalls telling the detectives about Kathleen's embezzlement, and that he gave them a copy of the report.

did not mention it in their reports, nor did they inventory the Suspicious Activity Report. Deputy D.A. Brancart had no knowledge about Kathleen's embezzlement until long after Mr. Coones' conviction. Investigators did not disclose to Kalb before trial that they discovered Kathleen had been embezzling from Midwest Credit Union. Had Kalb known this information, she would have presented it as part of the defense.

- ### *GSR Tests*

On April 18, 2019, the KBI Lab tested the GSR swabs originally taken as evidence in Coones' case for pGSR. No GSR was detected on the swabs taken from Mr. Coones' van, no GSR was detected on Kathleen's right hand, but there was GSR on Kathleen's left hand.

- ### *Pillow*

CSI Officers Barajas, Dressler, and Harper had collected a multi-colored pillow found near Carl's body at the crime scene. On September 29, 2020, an investigator for the prosecutor's office found a fourth bullet in the stuffing of the pillow that was lying near Carl Schroll's head at the site of his murder.

- ### *KBI Document Examination of Senior's Checks*

Part of the elder abuse investigation by Detective Block before Kathleen's death involved consulting with an expert document examiner from the KBI, who issued a report on July 27, 2007. The report identifies Kathleen as a suspect, and the examiner found "strong indications" that all but three of the 120 checks submitted for review may not have been authored by Senior, although due to the poor quality of the copies sent for evaluation, "he could not be eliminated as the author."[38] This report was not included in the Schroll death investigation case file with the other documents from that investigation. Instead, Detective Block placed it in his personal file.

---

[38] Doc. 106-26.

Kalb spoke to detective Block before trial, but he did not mention sending checks to the KBI or the KBI report itself. Kalb also contacted Detective Brown, and she responded that she had no exculpatory evidence. The State never produced the report to Kalb. If it had been produced, Kalb would have used it in Mr. Coones' defense.

- *Autopsy*

As stated earlier, Dr. Mitchell did not receive any information from the KCKPD about the circumstances of the Schrolls' deaths other than the statement that a call had been placed by Kathleen before her death indicating there was an assault. Dr. Mitchell does not recall knowing that the gun used to kill Kathleen and Carl was Kathleen's gun; that there was no sign of forced entry; or that Kathleen had been embezzling money before her death. Dr. Mitchell now maintains that, had he known these facts, he would have determined that Kathleen's most likely cause of death was suicide.

### Post-Conviction Proceedings

Mr. Coones successfully challenged his conviction and sentence under K.S.A. § 60-1507. On November 5, 2020, the Wyandotte County District Court of Kansas vacated Mr. Coones' conviction, all charges against him were dismissed, and he was released from custody. Before his conviction was vacated, Mr. Coones spent more than twelve years incarcerated. Mr. Coones passed away 108 days after his release, on February 21, 2021. Mr. Coones was posthumously granted a certificate of innocence, and the records of his conviction and arrest were expunged.[39]

### KCKPD Policies and Practices

- *Written Policies*

---

[39] Doc. 106-29.

The KCKPD has policies that homicide detectives must follow when they conduct homicide investigations, including Crime Scene Responsibilities, EMS, and Community Deaths General Order (Order Number 40.5); Criminal Investigation Unit Standard Operating Procedure ("SOP"); Property General Order (Order Number 80.02); Report Procedure General Order (Order Number 80.03); and Addendum Report General Order (Order Number 80.04).  Homicide detectives are supervised under the Criminal Investigation Unit SOP, and under Organization of Duties General Order 1.3.

The SOP for the Criminal Investigation Unit includes the job descriptions for each rank, and within each of those sections, it includes their authority and responsibilities.  The homicide captains were responsible for reviewing all crime reports in the homicides they oversaw and ensuring the detective was still working on it or following up on the status of the case. Detectives were made aware and expected to know SOP updates.  Thus, detectives within the Criminal Investigative Bureau received Advanced Officer Training specifically on the SOP.

The SOP does not require detectives to put every fact or step in the investigative narrative of their reports; rather, detectives should put facts in the investigative narrative which will assist them in testifying later.  Homicide detectives were allowed to destroy their notes, as keeping the notes would be duplicative of their reports.  Captains reviewed reports for completeness and legibility, making sure that pages are not missing, and looking for things that are usually included in a criminal investigative file.  Supervisors rely on detectives to follow the rest of the general orders in being truthful and accurate.

In the KCKPD, "[s]olving homicide cases has a very, very high priority.  People who accomplish that are held in high esteem and they get promoted."[40]

---

[40] Doc. 106-34 at 97:5–8.

- ***Complaints of Police Misconduct***

The KCKPD is unaware of any examples of officers failing to report misconduct by other officers or being punished for failing to report misconduct between 2006 and 2009.   But there were numerous instances of civilian complaints, and officers were aware of misconduct; specifically, misconduct by Roger Golubski, who was the Captain of the robbery/homicide unit in 2008 and 2009 during the Schroll murder investigation and trials.

Civilian complaints of misconduct were categorized by the KCKPD as administrative or criminal, and administrative complaints could be categorized as "other contacts."   "Other contacts" complaints were not supposed to include any "significant" allegations of misconduct; instead, they were to include only "administrative" and "minor" complaints.   However, from 2005–2009, the KCKPD's "other contacts" complaints included 54 complaints of excessive force (out of 91 total), 8 complaints of civil rights violations (out of 9 total), and 80 complaints of harassment (out of 88 total).   For example, in the case of a complaint that a detective "tried to make [a suspect] say things he did not do"—i.e., coercively interrogating a suspect—the KCKPD determined it could be appropriately handled as an "other contacts" complaint because the suspect "probably wasn't telling . . . the truth."[41]

Internal affairs did not monitor the steps taken in "other contacts" investigations.   Under KCKPD policy, the investigator could complete the investigation with a mere statement, "no discipline warranted."[42]   There were no specific guidelines on how to investigate "other

---

[41] Doc. 106-32 at 129:3–130:10.

[42] Doc. 106-30 at 76:8–18.  Some pages from the deposition of the Unified Government's Rule 30(b)(6) witness cited by Plaintiff were not attached to the exhibit.  The Court only includes facts with attached record support.

contacts" complaints.  Internal affairs kept no records of discipline initiated by supervisors.  In fact, nothing needed to be documented in "other contacts" investigations.

KCKPD superiors did not welcome reports or complaints about fellow officers. Illustrative of this culture is that sexual misconduct was widely regarded within the KCKPD as "no big deal."[43]  Indeed, the Unified Government received a complaint in 2009 that Detective Michael told an arrestee "he would have paid to see her in her thong" and that "he likes a little chocolate in his coffee," after she had been detained in a holding cell.  The KCKPD treated this as an "other contact" complaint and retained no record of the investigation other than a notation that the officer was "verbally counseled," and the record purged.[44]

The FBI investigated KCKPD officers for misconduct in the 1990s, but the KCKPD never initiated policy changes, sought additional information about the officers under investigation by the FBI, or took any other action other than producing subpoenaed documents, in response to that investigation.[45]

KCKPD detectives, along with older officers and the commanders, knew that Golubski was pursuing Black females and having sex with them, and that Golubski had fathered children with poor, Black women in the north end of Kansas City, Kansas.  Witnesses inside and outside the KCKPD knew that Golubski had sexual encounters with Black informants.  Officers in the

---

[43] Doc. 106-48 ¶ 14.  The Court overrules Defendants' objection to the statements in Seifert's affidavit as not based on personal knowledge.  His affidavit establishes that he worked for the KCKPD for thirty years, attending the police academy with Golubski.  He shared an office with Golubski from 1993 to 1995 in the Detective Bureau.  The Court is satisfied that these statements are based on personal knowledge and would be admissible at trial.

[44] Doc. 107 (sealed).

[45] Defendants object to this statement of fact, but it was an admission.  *See* Doc. 106-33 at 1, 3; Doc. 106-30 at 10:5–19.

KCKPD were "not allowed" to know the names of Golubski's informants, who were not documented.

Golubski committed an integrity violation early in 1978, causing him to be added to the KCKPD's *Brady/Giglio* list, which disclosed his misconduct to prosecutors. The KCKPD received complaints about Golubski's misconduct as early as the 1980s, but they refused to investigate or follow-up on them. In all, Golubski received 11 administrative complaints and "other contacts" complaints between 1993 and 2011. These included complaints that he bent a subject's arm and slapped her face, swore at a juvenile suspect and tried to coerce him into making incriminating statements, arrested a suspect without probable cause, and made racial and sexual comments towards a witness. Golubski also had a pattern of fabricating and suppressing evidence.

For example, in 2005, Sara Bigelow called to complain that Golubski divulged confidential information about her being an FBI informant and targeted her to help the family member of a criminal defendant in a federal drug case, but Golubski was never questioned about it. In another example, a mother complained in 2008 that Golubski kicked in her door and arrested her son for no reason. The KCKPD classified the complaint as "other contact," and closed it without any indication that they interviewed witnesses or collected information. In November 2009, a woman reported that Golubski threatened to "haul her [B]lack ass in for aiding and abetting," and told her to "change who she was dating."[46] The only documentation is a brief description that Major Ward investigated by talking to "the witnesses present and it

---

[46] Doc. 106-43 at 10.

3820

appears that the story concocted by Trellia Jackson is a total fabrication of the incident.  There is 'no discipline warranted' in this incident."[47]

Ronald Miller, who was Chief of Police for KCKPD from 2000 to 2006, "knew that [Golubski] liked [B]lack women, young [B]lack women" as part of his informant network.[48] And Michael Lee Kobe, who supervised Golubski for some time in the early 2000s, testified in his deposition that he did not

> think it would have been possible for Detective Golubski to—to have operated as he did without the knowledge of commanders knowing what he was doing and how he was operating. . . .  [H]e may have gotten it done once or twice, but the pattern was over a lengthy period of time and I don't think that that pattern could have . . . reasonably escaped the notice of a commander."[49]

Nonetheless, the KCKPD and Unified Government claim to be aware of only one disciplinary proceeding or internal affairs investigation regarding Golubski: the 1978 complaint for which he was suspended.  In 2022, Golubski was criminally charged in federal court in two cases: (1) for sexually assaulting two witnesses from 1999 to 2002;[50] and (2) for providing protection in a sex trafficking scheme.[51]

- ***Homicide Investigation Supervision in 2008–09***

Golubski was promoted to Captain in 2002 and joined the robbery/homicide division in 2006.  He was Captain of the robbery/homicide unit in 2008 and 2009 during the Schroll murder investigation.  Golubski approved the final report summarizing the investigation because the supervising Captain "wasn't available," and he signed off on Detectives Michael and Garrison's

---

[47] *Id.*

[48] Doc. 106-41 at 243:13–244:9.

[49] *Id.*

[50] Case No. 22-40055-TC (D. Kan.).

[51] Case. No. 22-40086-TC-4 (D. Kan.).

Addendum/Clearance report.  Golubski also assigned Detective Block to attend the Schrolls'

autopsies, and attended a meeting where Detective Block shared information with Detectives

Garrison and Michael about his elder abuse investigation by Kathleen.

## III.    Discussion

### A.    Individual Capacity Claims under 42 U.S.C. § 1983

Plaintiff alleges claims for relief under 42 U.S.C. § 1983 against the individual

Defendants in their individual capacities for: (1) due process violations based on fabricating,

withholding, and failing to preserve evidence; (2) malicious prosecution; (3) failure to intervene;

and (4) conspiracy.  Defendants invoke qualified immunity.  Thus, "the onus is on the plaintiff to

demonstrate '(1) that the official violated a statutory or constitutional right, *and* (2) that the right

was "clearly established" at the time of the challenged conduct.'"[52]  Defendants will prevail on

the qualified immunity defense if Plaintiff fails to establish either prong of the qualified

immunity test.[53]  In making this determination, the Court "ordinarily accept[s] the plaintiff's

version of the facts . . . but 'because at summary judgment we are beyond the pleading phase of

the litigation, [the] plaintiff's version of the facts must find support in the record.'"[54]

### 1.    Due Process Claims

In Count I, Plaintiff alleges due process violations against Defendants Michael, Garrison,

Block, and Brown for withholding, failing to preserve, and fabricating evidence.  In the Pretrial

Order, Plaintiff provides a laundry list of evidence she claims was withheld in violation of Mr.

Coones' due process rights: (1) that Mr. Coones' children were restrained and taken into custody

---

[52] *Johnson v. City of Cheyenne*, 99 F.4th 1206, 1217 (10th Cir. 2024) (quoting *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015)).

[53] *Id.* (quoting *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016)).

[54] *Id.* (second and third alteration in original) (quoting *A.M.*, 830 F.3d at 1136).

3822

during their interviews; (2) handwritten notes and recordings of witness interviews; (3) an exculpatory written statement by Minks corroborating Mr. Coones' alibi; (4) video of the crime scene; (5) a QuikTrip surveillance video disproving Kathleen's story of being threatened by Mr. Coones; (6) that Detective Michael's investigation corroborated Mr. Coones' account of where his van was parked (i.e., it had not been used to commit a murder); (7) that Kathleen and Carl were experiencing marital tension just before the murder; (8) that Robert Rupert had been promised leniency for his cooperation; (9) Defendants Michael and Garrison caused gunshot residue swabs to not be tested by the lab; and (10) that Kathleen's embezzlement had been discovered by the credit union that employed her immediately following the murder-suicide. Defendants address each of these in their motion for summary judgment on the due process claim.

In response to Defendants' motion for summary judgment on the withholding claim, Plaintiff discusses only three categories of evidence—Kathleen's embezzlement, the KBI expert report about Senior's checks during the earlier elder abuse investigation, and that the detectives went to QuikTrip, watched the surveillance video, and did not see Kathleen and Mr. Coones on the footage arguing as she had reported. Plaintiff also asserts that Detective Michael fabricated his claim that Mr. Coones' van was not in his driveway the morning after the murders. The Court addresses each of Plaintiff's claims under the appropriate due-process tests below.

### a.  Failure to Disclose

Plaintiff first asserts a due process violation because the State failed to disclose certain evidence before trial. This type of claim is governed by *Brady v. Maryland*.[55]  Under the *Brady*

---

[55] *See id.* at 1226 ("*Brady* 'address[es] exculpatory evidence still in the government's possession.'. . . *Youngblood* and *Trombetta* 'govern cases in which the government no longer possesses the disputed evidence.'" (alteration in original) (quoting *Fero v. Kerby*, 39 F.3d 1462, 1472 (10th Cir. 1994))).

3823

doctrine, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[56]  The elements of a *Brady* violation are: "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the defense."[57]

Because Defendants invoke qualified immunity on this claim, the burden is on Plaintiff to demonstrate a constitutional violation that was clearly established at the time of the violation that has evidentiary support in the record.  The Court therefore confines its analysis to the evidence discussed in Plaintiff's summary judgment response—Kathleen's embezzlement and financial distress, the check forging report, and the detectives' review of the QuikTrip video.  Defendants argue none of this evidence was material to the defense at Mr. Coones' trial.  In order to show materiality, Plaintiff must show "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."[58]  In evaluating materiality, the Court is not to "consider each piece of withheld evidence in isolation.  Rather [the Court] review[s] the cumulative impact of the withheld evidence, its utility to the defense as well as its potentially damaging impact on the prosecution's case."[59]  Plaintiff asserts that the evidence, when viewed cumulatively, and in the light most favorable to her, was material to the defense. The Court agrees.

---

[56] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[57] *Becker v. Kroll*, 494 F.3d 904, 924 (10th Cir. 2007) (quoting *United States v. Geames*, 427 F.3d 1333, 1337 (10th Cir. 2005)).

[58] *Cone v. Bell*, 556 U.S. 449, 470 (2009).

[59] *Fontenot v. Crow*, 4 F.4th 982, 1080 (10th Cir. 2021) (quoting *Simpson v. Carpenter*, 912 F.3d 542, 572 (10th Cir. 2018)).

     *i.*  *Embezzlement Evidence*

First, the Court agrees with Plaintiff that, when viewed in the light most favorable to her, evidence of Kathleen's embezzlement from her credit union employer and Jones' Suspicious Activity Report was material.  The report showed that Kathleen embezzled over $11,000 from her employer before her scheme was uncovered the day after she died.  It is uncontroverted that the detectives interviewed Jones on April 14, 2008, five days after Jones created the Suspicious Activity Report documenting Kathleen's embezzlement.  And at the § 60-1507 hearing in 2020, Jones testified that he told the detectives about the embezzlement and provided them with the report.  Detective Michael also testified that Jones told him about the embezzlement, and that Jones gave either him or Detective Garrison the report but he did not know what happened to it. Both Jones and Detective Michael testified later during their depositions in this case that, in hindsight, they now cannot recall whether those previous statements under oath were accurate. Of course, at the summary judgment stage, the Court views the evidence in the light most favorable to Plaintiff, crediting the 2020 testimony that Jones told the detectives about the embezzlement and report, and provided them with the same.  A reasonable jury could easily conclude that the 2020 testimony was more reliable given that it was closer in time to the events in question.

Defendants are correct that at retrial, Mr. Coones' defense attorney introduced evidence and argued that Kathleen committed suicide.  But there is no evidence in the summary judgment record about the strength of the defense's evidence, other than the prosecutor argument in closing that "Kathleen did not put a gun in her mouth. She did not put a gun to her temple.  No evidence suggests that she would have any motivation other than to do anything to live and keep

on living."[60]  Obviously, the jury rejected whatever evidence Mr. Coones presented.  Evidence of

Kathleen's embezzlement supports the defense theory of murder-suicide by providing a motive

for Kathleen to commit suicide.  It also corroborates the defense theory that Kathleen was

stealing money from Senior, because it shows similar behavior with a subsequent employer.

Moreover, such evidence supports the defense's theory at trial that Kathleen had a reason to

frame Mr. Coones for her murder, given that he was trying to prove that she had stolen money

from his father.  Plaintiff has met her burden of demonstrating that the embezzlement evidence

"could reasonably be taken to put the whole case in such a different light as to undermine

confidence in the verdict."[61]

## ii.    Forgery Evidence

Next, Plaintiff asserts that Defendants withheld evidence from Detective Block's 2007

investigation into whether Kathleen was forging Senior's checks.  Specifically, Plaintiff argues

that the State had a duty to disclose a report from the KBI's expert document examiner, who

examined 120 checks purportedly signed by Senior, and found "strong indications" that all but

three may not have been authored by him.  This report lists Kathleen's name as the suspect.

Defendants concede that this evidence was withheld, but argue that it was not material because it

did not conclusively eliminate Senior as the author of the checks.  Defendants also argue that Mr.

Coones procured an expert opinion from his own expert, Royce Smith, before trial that

concluded some of the checks were forged; yet, the defense did not present this evidence.

Defendants argue that the KBI report was speculative and inconclusive, and therefore not

---

[60] Doc. 101-16 at 13:1–5.

[61] *Cone*, 556 U.S. at 469–70 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

relevant. Finally, Defendants assert information regarding Mrs. Schroll's alleged fraud concerning Senior was included in their reports and addressed during trial

Plaintiff has come forward with evidence that Kalb requested exculpatory information from both Detectives Block and Brown and, if this report had been produced, Kalb would have used it in Mr. Coones' defense at trial. Kalb would have called the KBI examiner to testify at trial, and Plaintiff maintains that he would have been a stronger witness for the defense than Mr. Coones' own expert. Also, Plaintiff points to evidence that Detective Block not only suspected Kathleen was taking advantage of Senior, he testified at trial that Senior's bank account was drained while he was in Kathleen's care. The report would have lent credence to Mr. Coones' position that Kathleen had been forging Senior's checks. And the KBI witness would have been a stronger witness than the defense's expert. The Court finds that Plaintiff has demonstrated evidence of a *Brady* violation by Detective Block when this evidence is viewed in the light most favorable to Plaintiff, together with the embezzlement evidence. The Court does not find evidence that Brown had knowledge of the existence of the KBI Report when Kalb requested it.

### iii. QuikTrip Video

Blair reported to detectives and testified at trial that Kathleen told her Mr. Coones threatened Kathleen at a QuikTrip gas station after work on April 5, 2008, when Kathleen was walking out and Mr. Coones was walking in. According to Blair, Mr. Coones was driving "the van," and told Kathleen: "You're not going to be spending my dad's money no more, bitch."[62] The morning after the deaths, Mr. Coones denied to the detectives that the QuikTrip encounter occurred. If Kathleen's report to Blair is believed, Mr. Coones threatened Kathleen two days before her death, strong evidence that Mr. Coones had a motive to kill her.

---

[62] Doc. 101-2 at 40.

It is uncontroverted that Detectives Michael and Garrison went to the QuikTrip and requested surveillance footage from April 5, that an employee burned a CD copy of the surveillance footage, that the detectives brought the CD back to the police station and viewed it, that the footage only showed the interior of the store, and that they did not see Kathleen or Mr. Coones on the video.

Plaintiff points to the state's failure to disclose that detectives obtained and viewed the QuikTrip surveillance video from April 5, and did not see either Kathleen or Mr. Coones on the footage. Defendants argue that the QuikTrip surveillance video was not material because Detective Michael testified at the criminal trials and in his deposition in this case that the video did not show the area of the alleged confrontation and did not show either Kathleen or Mr. Coones. But the Court must view the facts in the light most favorable to Plaintiff. Plaintiff has submitted evidence that Kalb spoke to Detective Michael before trial about the encounter at QuikTrip that Blair had relayed to the detectives. Detective Michael told Kalb that "he investigated it and could not find the video."[63] At the retrial, Detective Michael testified that he could not recall whether Blair told him that the confrontation occurred inside or outside the store. He further testified that he and Detective Garrison went to the QuikTrip and that the employee burned a CD for them, but that it only showed the interior of the store and did not show Kathleen and Mr. Coones.

Assuming the QuikTrip video confirmed Detective Michael's trial testimony, it was not cumulative. A reasonable jury could find that the QuikTrip video, standing alone, made a difference because it showed no confrontation between Kathleen and Mr. Coones, which was used as evidence at trial because it occurred two days before her death. And, as Plaintiff urges,

---

[63] Doc. 106-12 at 145:16–17.

there was other evidence of Kathleen's untruthfulness, such as the lack of a restraining order or police reports filed by her against Mr. Coones. A reasonable jury could find that this evidence tipped the scales in terms of supporting the defense theory that Kathleen had been lying to her family about Mr. Coones harassing her, and specifically lied about harassing her two days before her death. When viewed in the light most favorable to Plaintiff, cumulatively with the other withheld evidence, Plaintiff has demonstrated materiality.

*iv.    Clearly Established*

It was clearly established at the time of the Schroll death investigation that when exculpatory evidence is withheld from the defense it implicates the defendant's due process rights.[64] Defendants argue that it was not clearly established in 2008 that an officer, as opposed to a prosecutor, had a duty to disclose under *Brady*. They are simply incorrect. The Tenth Circuit made clear as early as 1995 that "*Brady* requirements 'extend[ ] to . . . law enforcement personnel."[65] Indeed, "investigative officers are part of the prosecution, the taint on the trial is no less if they, rather than the prosecutors, were guilty of nondisclosure."[66] Thus, it was clearly established that the detectives were subject to *Brady* at the time of the Schroll murder investigation.[67]

---

[64] *See Bledsoe v. Carreno*, 53 F.4th 589, 613 (10th Cir. 2022).

[65] *Id.* at 613 & n.21 (first citing *Pierce v. Gilchrist*, 359 F.3d 1279, 1299 (10th Cir. 2004); and then citing *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 824 (10th Cir. 1995)).

[66] *Smith*, 50 F.3d at 824 (quoting United States v. *Buchanan*, 891 F.2d 1436, 1440 (10th Cir. 1989)). Indeed, Judge Vratil rejected this exact argument in *McIntyre v. Unified Government*, No. 18-2545-KHV, 2022 WL 2072721, at *5 (D. Kan. June 9, 2022) ("Since well before 1986 . . . the law has established that due process prohibits the state—including one of its investigators—from withholding exculpatory evidence." (citing *Pierce*, 359 F.3d at 1299)).

[67] The Court respectfully disagrees with the footnoted discussion from *Ganley v. Jojola*, cited by Defendants on this issue. 402 F. Supp. 3d 1021, 1093 n.37 (D.N.M. 2019). As described in the next section, bad faith would only be required if this was a failure-to-preserve claim and the evidence was only potentially useful. *See Johnson v. City of Cheyenne*, 99 F.4th 1206, 1226 (10th Cir. 2024) (explaining the distinction between cases that allege due process violations based on *Brady* and those based on *Trombetta/Youngblood*). To the extent Plaintiff

### b. Failure to Preserve

It is undisputed that detectives did not collect or inventory the QuikTrip surveillance video. And Detective Michael admitted during his deposition that it should have been documented and inventoried under normal practice. Plaintiff argues that she only asserts a *Brady* claim as to the QuikTrip video, but to the extent she also maintains that the video itself should have been collected and preserved by Detectives Michael and Garrison, a different line of authority applies. Under the due process clause, the State must preserve evidence that is constitutionally material: "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."[68] Evidence is material if it is "favorable to the accused, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal."[69] In *Arizona v. Youngblood*,[70] the Supreme Court provided that if the evidence is instead only "potentially useful" for the defense, then the defendant must show that the government acted in bad faith in destroying the evidence.[71]

Defendants suggest *Youngblood* applies and that Plaintiff must show that the detectives acted in bad faith. The Court disagrees. For the reasons discussed on the *Brady* claim, this evidence was material. Therefore, Plaintiff is not required to show that detectives acted in bad faith under *Youngblood* by failing to inventory and preserve the evidence. To the extent Plaintiff

---

alleges a failure-to-preserve claim, she has demonstrated evidence of materiality, so no bad faith showing is required. The Court considers intent at the conclusion of its qualified immunity analysis.

[68] *California v. Trombetta*, 467 U.S. 479, 489 (1984).

[69] *See United States v. Sullivan*, 919 F.2d 1403, 1427 (10th Cir. 1990) (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)).

[70] 488 U.S. 51 (1988).

[71] *Id.* at 58.

3830

asserts a due process violation based on *Trombetta* for failure to preserve exculpatory evidence, that rule was clearly established in 2008.[72]

### c. Fabrication

Finally, Plaintiff alleges a due process claim based on fabrication of evidence. To show fabrication, Plaintiff must demonstrate:

> (1) the defendant knowingly fabricated evidence, (2) the fabricated evidence was used against the plaintiff, (3) the use of the fabricated evidence deprived the plaintiff of liberty, and (4) if the alleged unlawfulness would render a conviction or sentence invalid, the defendant's conviction or sentence has been invalidated or called into doubt.[73]

In their summary judgment motion, Defendants' only argument specific to this claim is that "Det. Michael went to the cul de sac where Coones lived. He did not see Coones' van. Nothing during the investigation corroborated, as fact, that Coones[] could not have used his van to commit the murder."[74] In the summary judgment response, Plaintiff maintains that Detective Michael fabricated evidence that Mr. Coones' van was not parked outside his house the morning after the Schroll deaths, and argues that Defendants waived moving on the fabrication claim by not separately addressing it. The Court agrees with Plaintiff that Defendants' motion is insufficient to trigger invocation of qualified immunity, or otherwise move for summary judgment, on Plaintiff's fabrication claim. Defendants make no argument specific to the elements discussed above. Nor do they acknowledge in their motion that the fabrication claim requires a separate test from the *Brady* claim. The Court will not conduct that analysis on its own.

---

[72] *See Trombetta*, 467 U.S. at 488–89; *Johnson v. City of Cheyenne*, 99 F.4th 1206, 1226 (10th Cir. 2024).

[73] *Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021) (footnotes omitted).

[74] Doc. 101 at 25.

The Court further finds that, to the extent Defendants' limited argument on this claim was sufficient to challenge it on summary judgment, Plaintiff has met her burden of coming forward with evidence creating a strong issue of fact about whether Detective Michael fabricated his testimony about the van.  Detective Michael testified at trial that he personally went to the Coones' residence after the murder, that he did not see the brown van there, and that he would have seen it based on where the tire ruts were located when he viewed the backyard on the morning of April 7, 2008.  But viewing the evidence in the light most favorable to Plaintiff, multiple witness accounts supported Mr. Coones' statement to police that the van was parked behind his house and in front of Minks' vehicle, including his own, Plaintiff's, Minks', and his son, Ben's.  And Detective Michael failed to document his vantage point on the morning of the Schroll deaths.  The Court must also credit Minks' testimony that he tried to contact the detectives and give an alibi statement, even though Detective Michael testified he had no recollection of that.

Viewing this evidence in the light most favorable to Plaintiff, she has demonstrated a constitutional violation.  In addition, it was clearly established in 2008 that an investigator could not fabricate evidence in order to secure a showing of probable cause, or a guilty verdict at trial.[75]

### d.  Personal Responsibility

In addition to the foregoing, in order to prevail on a claim under § 1983 for these due process violations, Plaintiff must demonstrate that the individual defendants had "direct personal responsibility for the claimed deprivation of [his] constitutional rights under *Brady*, or

---

[75] *See Bledsoe v. Carreno*, 53 F.4th 589, 612 (10th Cir. 2022) ("[T]his court has long recognized that 'the prohibition of falsification or omission of evidence, knowingly or with reckless disregard for the truth, was firmly established as of 1986.'" (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004))).

*Trombetta/Youngblood*,"[76] and that "they acted with the requisite mental state."[77]  Specifically, Plaintiff must show that the officers acted "with deliberate or reckless intent."[78]

Plaintiff has demonstrated personal responsibility and at least reckless intent on behalf of Detective Michael and Garrison.  Viewing the evidence in the light most favorable to Plaintiff, these detectives were personally responsible for completing the investigative reports, viewing and then withholding evidence of the QuikTrip video, the embezzlement evidence, and the KBI expert report.  Given the allegations in the case, as reasonable jury could find that these detectives' conduct went beyond mere negligence because they should have understood the importance of the evidence and yet, failed to produce it to the prosecutors or the defense.  Moreover, if the jury believes Plaintiff's version of the facts, Detective Michael knowingly or with reckless disregard for the truth, testified falsely about whether he could have seen Mr. Coones' van on the morning of the Schroll deaths.  This evidence is sufficient to demonstrate personal participation and intent.

However, there is no evidence demonstrating either personal participation on these issues or intent on behalf of Detectives Block and Brown.  There is no evidence about Brown's role in withholding or failing to preserve any of this evidence.  Block was originally assigned to the elder abuse investigation and passed along information to the homicide detectives about that.  But there is no evidence that he made an affirmative decision to withhold the KBI Report from the homicide investigative file.  Thus, the Court finds that summary judgment is warranted on these claims as to Detectives Block and Brown.

---

[76] *Johnson v. City of Cheyenne*, 99 F.4th 1206, 1232 (10th Cir. 2024) (quoting *Porro v. Barnes*, 635 F.3d 1322, 1327 (10th Cir. 2010)).

[77] *Id.*

[78] *Id.* (collecting cases).

In sum, the Court finds that Plaintiff's individual-capacity due process claims survive summary judgment and that Defendants are not entitled to qualified immunity.

### 2. Malicious Prosecution

Count II alleges individual-capacity claims under § 1983 for malicious prosecution and unlawful pretrial detention under the Fourth and Fourteenth Amendments against Detectives Michael and Garrison. Defendants invoke qualified immunity, and argue that Plaintiff cannot show malicious prosecution with respect to the arrest warrant, or the judge's probable cause finding after the preliminary hearing. In response to Defendants' motion for summary judgment, Plaintiff argues that "Defendants Michael and Garrison . . . lied at the preliminary hearing and withheld critical evidence from the court deciding probable cause."[79] When evaluating a Section 1983 malicious-prosecution claim, the court begins with the common law elements for malicious prosecution, but the ultimate question is whether Plaintiff has proven the deprivation of a constitutional right.[80] A plaintiff must show that "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages."[81]

Defendants concede that Plaintiff can demonstrate causation, favorable termination, and damages. But they argue that Plaintiff cannot demonstrate the third or fourth elements of the claim—lack of probable cause for Mr. Coones' confinement and prosecution, or malice.

### a. Probable Cause

---

[79] Doc. 106 at 29.

[80] *See Pierce v. Gilchrist*, 359 F.3d 1279, 1288–89 (10th Cir. 2004).

[81] *Bledsoe v. Carreno*, 53 F.4th 589, 614 (10th Cir. 2022).

The Tenth Circuit has explained that probable cause means "a 'substantial probability' existed that the suspect committed the crime, requiring something 'more than a bare suspicion.'"[82]  In the context of fabricated or withheld evidence, like Plaintiff alleges here, the inquiry is  "whether, 'without the falsified inculpatory evidence, or with the withheld exculpatory evidence, there would be no probable cause for [Mr. Coones'] continued confinement or prosecution."[83]   In the context of a qualified immunity defense, the Court asks "'whether there was "arguable probable cause"' for the challenged conduct.  Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists."[84]

Defendants argue that (1) there was ample evidence to support probable cause, (2) the officers were not required to accept or investigate a suspect's claim of innocence; and (3) the court's probable cause finding at the preliminary hearing obviated any lack of probable cause by the detectives.  Plaintiff responds that the only evidence implicating Mr. Coones was Kathleen's phone call to her mother immediately before her death, and that officers were unable to corroborate any of Kathleen's claims about Mr. Coones harassing her, in contrast to "a bounty of evidence exculpating Mr. Coones."[85]  Plaintiff further argues that the preliminary hearing did not obviate any lack of probable cause that preceded it because Detective Michael falsely testified at the preliminary hearing about his ability to see the van at Mr. Coones' home on the morning of

---

[82] *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) (quoting *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011)).

[83] *Bledsoe*, 53 F.4th at 614–15 (quoting *Pierce*, 359 F.3d at 1295).

[84] *Stonecipher*, 759 F.3d at 1141 (quoting *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012)) (citing *Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007)).

[85] Doc. 106 at 29.

April 7, and because the autopsy report relied on by the judge was based on incomplete information provided to the examiner by the detectives.

First, the Court considers Defendants' argument that there was arguable probable cause to bind Mr. Coones over for trial. Defendants point to the following evidence they claim supported an objectively reasonable belief that probable cause existed: (1) Kathleen's dying declaration identifying Mr. Coones as the killer; (2) that Kathleen was shot in the back of the head with a contact wound; (2) that Carl was found dead with two bullet wounds to the torso; (3) reports from Kathleen's family, Mr. Coones' family and Mr. Coones himself of the ongoing dispute over Kathleen's acquisition of Senior's assets; and (4) that none of the people interviewed that were in Mr. Coones' house on April 7 could definitively account for his whereabouts at the time of the 911 call.

Given Plaintiff's allegations that the detectives withheld and fabricated evidence, the Court must consider whether the evidence supported a reasonable belief in Mr. Coones' guilt: (1) without Detective Michael's testimony that the van was not at Mr. Coones' house on the morning of April 7; (2) with evidence that the detectives viewed the QuikTrip surveillance video and did not see Kathleen or Mr. Coones on it during the time in question on April 5; (3) with the Suspicious Activity Report Jones gave them and his statements to them in 2008 about her embezzlement; and (4) with the KBI examiner's check forgery report.

When viewed in the light most favorable to her, Plaintiff has met her burden of showing that the State lacked arguable probable cause for Mr. Coones' prosecution when disregarding Detective Michael's statement about the van and when considering the QuikTrip evidence, the embezzlement evidence, and the KBI report. Defendants do not dispute that they did not mention at the preliminary hearing that the detectives had requested the QuikTrip surveillance

video, watched it, and could not find any footage of the pair, despite Blair's report that it had occurred in the doorway two days before the Schrolls' deaths. With respect to the van, Detective Michael testified that he would have seen the van had it been parked where Mr. Coones and his family said it was when he scouted the house on foot on the morning of April 7, statements that Plaintiff maintains are false. The prosecutor relied on this testimony in arguing that Mr. Coones was not where he told police he was at the time of the murder. And, while there was evidence presented about Mr. Coones' statements that Kathleen fraudulently caused his father to transfer real estate and life insurance to her, the State did not present any information to the judge about the 2007 elder abuse investigation.

Indeed, in his closing remarks at the preliminary hearing, Deputy D.A. Brancart highlighted the following evidence: (1) Kathleen's phone call to her mother, (2) that Mr. Coones' motive was the "disputed estate passing, with substantial dollar value"; (3) that Mr. Coones' account of his whereabouts the night of April 7 was "inconsistent with the facts the police knew."[86] The fabricated and withheld evidence calls into question each of the grounds cited by the prosecutor for Mr. Coones' prosecution.

Defendants argue that detectives were not required to resolve conflicting evidence or make credibility determinations in order to meet the probable cause standard. While this may be true, the Court disagrees with Defendants' characterization of Plaintiff's claims. Her claims are not that the detectives made incorrect credibility determinations, it is that they wholly ignored exculpatory evidence and fabricated inculpatory evidence that was then relied on to obtain an arrest warrant and bind Mr. Coones over for trial.

---

[86] Doc. 101-6 at 65:3–11.

Defendants argue that the judge's probable cause finding after the preliminary hearing

obviates any lack of probable cause prior to that point.  To be sure, under Tenth Circuit law, "the

chain of causation is broken by an indictment, absent an allegation of pressure or influence

exerted by the police officers, or knowing misstatements made by the officers to the

prosecutor."[87]  In *Taylor v. Meacham*, the court explained:

> Here, too, there was a preliminary hearing, which, under Utah law
> is an adversarial proceeding, in which a judge independently
> listened to testimony, evaluated the credibility of those testifying,
> reviewed evidence, and concluded that the evidence was sufficient
> to bind Mr. Taylor over for trial.  Thus, to the extent Sheriff
> Meacham set in motion a malicious prosecution, which we do not
> suggest that he did, the preliminary hearing broke the "chain of
> causation."  We therefore conclude that Sheriff Meacham did not
> violate Mr. Taylor's constitutional rights in connection with his
> arrest and incarceration.[88]

Two cases describe circumstances where the chain of causation was not broken by a

judge's probable cause findings at the preliminary hearing.  First, in *Pierce v. Gilchrist*, the

Tenth Circuit found that the chain of causation was not broken where a forensic technician

allegedly distorted evidence upon which the prosecuting authorities relied to press charges and

prosecute.[89]  The court explained: "If police officers have been instrumental in the plaintiff's

continued confinement or prosecution, they cannot escape liability by pointing to the decisions of

prosecutors or grand jurors, or magistrates to confine or prosecute him. They cannot hide behind

the officials whom they have defrauded."[90]  Similarly, in *Robinson v. Maruffi*, the Tenth Circuit

explained that where there is sufficient evidence that defendants "purposefully concealed and

---

[87] *Taylor v. Meacham*, 82 F.3d 1556, 1564 (10th Cir. 1996) (quoting *Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996)); *see also Barham v. Town of Greybull*, 483 F. App'x 506, 509 (10th Cir. 2012).

[88] *Id.* (footnote omitted) (citing *State v. Pledger*, 896 P.2d 1226, 1229 (Utah 1995)).

[89] 359 F.3d at 1293.

[90] *Id.* (quoting *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988)).

misrepresented material facts" to "the prosecutor, the grand jury, and the trial and appellate

courts[,] . . . [t]heir actions did not make an intervening break from the conduct of the

defendants."[91]

The Court agrees with Plaintiff that, when viewed in the light most favorable to her, the

detectives concealed and misrepresented material facts to the judge at the preliminary hearing.

The judge presiding over the preliminary hearing relied on Detective Michael's testimony about

the van, the prosecutor's recitation of Mr. Coones' motive, and on the autopsy report in finding

probable cause for Mr. Coones' prosecution. This is exactly the sort of situation where

preliminary hearing findings of probable cause do not break the chain of causation because there

are allegations and evidence of knowing misstatements and material omissions by the detectives

in this matter. Accordingly, the Court finds that Plaintiff can support the lack of probable cause

element of her malicious prosecution claim.

### b. Malice

Malice requires that a defendant acted either knowingly or recklessly.[92] Moreover,

"[m]alice may be inferred if a defendant causes the prosecution without arguable probable

cause."[93] Defendants argue that Plaintiff only alleges negligence by the detectives. Indeed, the

Tenth Circuit has explained that "the failure to investigate a matter fully, to exhaust every

possible lead, interview all potential witnesses, and accumulate overwhelming corroborative

---

[91] 895 F.2d 649, 655–56 (10th Cir. 1990).

[92] *Sanchez v. Hartley*, 810 F.3d 750, 756 (10th Cir. 2016).

[93] *Bledsoe v. Carreno*, 53 F.4th 589, 615 (10th Cir. 2022) (alteration in original) (quoting *Stonecipher v. Valles*, 759 F.3d 1134, 1146 (10th Cir. 2014)).

evidence rarely suggests a knowing or reckless disregard for the truth.  To the contrary, it is generally considered to be token negligence at most."[94]

The Court is not persuaded that the detectives' omissions and fabrication, when viewed in the light most favorable to Plaintiff, were merely negligent.  As described above, Plaintiff does not claim that the detectives failed to corroborate testimony or more fully investigate the Schroll deaths or Mr. Coones' alibi.  The alleged omissions are of facts known to the officers at the time of the hearing.[95]  And if the jury believes that Detective Michael fabricated evidence, it could easily determine that he did so knowingly.  Also, the Court has already determined that Plaintiff can demonstrate that the detectives acted without arguable probable cause; thus, malice may be inferred.  Plaintiff has made a substantial showing of deliberate falsehoods or reckless disregard for truth by Detectives Michael and Garrison in seeking the continued confinement and prosecution of Mr. Coones.

### c.  Clearly Established

Plaintiff has also demonstrated the second prong of the qualified immunity analysis on the malicious prosecution claim—that it was clearly established at the time of the investigation. Well before the Schroll death investigation was underway, the Tenth Circuit "held in *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004), that '[n]o one could doubt that the prohibition on falsification or omission of evidence, knowingly or with reckless disregard for the truth, was

---

[94] *Stonecipher*, 759 F.3d at 1142 (alteration omitted) (quoting *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994)).

[95] *Compare Romero v. Fay*, 45 F.3d 1472, 1479 (10th Cir. 1995) (finding no malice where police officers failed to speak with the plaintiff's alibi witnesses or contact those who saw another suspect threaten the victim), *with* ! *Sanders v. English*, 950 F.2d 1152, 1162 (5th Cir. 1992) (finding that, unlike cases were police offers were negligent for failing to follow up on investigative leads, "[a] fact-finder reasonably could conclude that Lt. McCoy deliberately looked the other way in the face of exonerative evidence indicating that he had arrested the wrong man: three alibi witnesses deemed credible by Lt. McCoy, a negative identification by one of the witnesses who helped compose the police sketch, and a belated identification by the victim under peculiar circumstances"), *abrogated on other grounds by Albright v. Oliver*, 510 U.S. 266 (1994).

3840

firmly established as of 1986, in the context of information supplied to support a warrant for arrest.'"[96]

In sum, the Court finds that Plaintiff has met her burden of demonstrating a constitutional violation of clearly established law as to Count II, and thus, Defendants' motion for summary judgment on this claim against Detectives Michael and Garrison is denied.

### 3. Failure to Intervene

In Count III, Plaintiff alleges individual-capacity claims under § 1983 for failure to intervene against Defendants Michael, Garrison, Block, and Brown. The Tenth Circuit has recognized a claim for failure to intervene under § 1983 because "all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."[97] To show a constitutional violation, Plaintiff must demonstrate the following elements: "1) a government officer violated [Mr. Coones'] constitutional rights, 2) a different government actor (the defendant) observed or had reasons to know about that constitutional violation, and 3) the defendant had a realistic opportunity to intervene, but failed to do so."[98]

The Court has already determined the due process and malicious prosecution claims against Detectives Michael and Garrison survive summary judgment. Plaintiff urges that because they investigated the case together, they both observed or had reason to know about those constitutional violations. The Court finds that a reasonable inference can be made from the evidence that they had knowledge of the other's constitutional violations and had a reasonable opportunity to intervene. Detective Block was the primary investigator on the elder abuse

---

[96] *Sanchez*, 810 F.3d at 759 (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1292 (10th Cir. 2004)).

[97] *Bledsoe*, 53 F.4th at 616 (quoting *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008)).

[98] *Id.* (citations omitted).

investigation, and the record reflects that the KBI report was filed in his personal file and not the

Schroll investigation file.  A reasonable inference could be made that he should have insured that

the report made it into that file given that he was contacted in the early stages of the death

investigation to provide information to the detectives.  However, Plaintiff fails to point to any

evidence that Brown had knowledge of a constitutional violation and failed to intervene.

Plaintiff asserts in a footnote that "it was clearly established in 1999 that police officers

had a duty to intervene to prevent the very sorts of constitutional violations at issue here."[99]  But

the Court agrees with Defendants that, assuming Plaintiff can demonstrate a constitutional

violation for each Defendant on this claim, the law was not clearly established that they each had

a duty to intervene in 2008 when they were investigating the Schroll deaths.

In 2022, the Tenth Circuit reversed a district court's decision denying qualified immunity

on a failure-to-intervene claim in the context of allegations that law enforcement officers

fabricated inculpatory evidence, withheld exculpatory evidence, and maliciously prosecuted the

plaintiff.[100]  The Court explained that in 1999, when the investigation at issue occurred, the Court

had not recognized a failure-to-intervene claim at all.[101]   And, prior to 2022, the Tenth Circuit

had only recognized in published decisions that this claim applied in the excessive force

context.[102]  For the first time in *Bledsoe*, the Tenth Circuit made clear that a failure-to-intervene

claim can apply to other constitutional violations:

> We hold that a failure-to-intervene claim is not limited to excessive
> force violations, but can involve other underlying constitutional
> violations.  Specifically, here, Bledsoe adequately alleged a
> violation of his constitutional rights premised on Defendants'

---

[99] Doc. 106 at 34 (citing *id.* at 617).

[100] *Bledsoe*, 53 F.4th at 617.

[101] Id.

[102] *Id.* at 616–17 (collecting cases); *see Vondrak*, 535 F.3d at 1210.

> failure to intervene in the alleged fabrication of evidence against
> Bledsoe, the suppression of exculpatory evidence that would have
> proven his innocence, and the malicious arrest, prosecution, and
> conviction of Bledsoe without probable cause to believe he was
> guilty.[103]

Plaintiff has therefore not met her burden of showing that it was clearly established in 2008 that

Defendants had a duty to intervene outside of the excessive force context.[104]

Plaintiff makes a cursory argument that it would have been obvious to any objectively

reasonable officer that they had a duty to intervene and stop the constitutional violations in this

case, under *Hope v. Pelzer*.[105]  On the clearly established prong of the qualified immunity

analysis, the plaintiff must generally "point to a Supreme Court or Tenth Circuit decision on

point, or the clearly established weight of authority from other courts must have found the law to

be as the plaintiff maintains."[106]  And, while "[w]e do not require a case directly on point, . . .

existing precedent [nonetheless] must have placed the statutory or constitutional question beyond

debate."[107]

Under *Hope*, a right may be clearly established if it would have been obvious to a

reasonable officer, despite the lack of on-point authority recognizing a failure-to-intervene claim

outside of the excessive force context.[108]  But "*Hope*'s holding historically has been applied to

only the 'rare "obvious case,"' involving 'extreme circumstances,' or 'particularly egregious'

---

[103] *Id.* at 617.

[104] *See id.*; *see also Shaw v. Schulte*, 36 F.4th 1006, 1020–21 (10th Cir. 2022) ("[W]here the intrusion and permanency of harm from the use of excessive force may exceed that from the relatively brief prolongation of a traffic stop, *Vondrak* does not clearly establish that an officer must intervene to prevent an illegal search and seizure. Accordingly, Mr. Bosire has not overcome the second prong of Trooper Schulte's qualified-immunity defense.").

[105] 536 U.S. 730, 741 (2002).  In *Bledsoe*, the plaintiff did not make that argument, so the court did not address it.  53 F.4th at 617.

[106] *Frasier v. Evans*, 992 F.3d 1003, 1014 (10th Cir. 2021) (quoting *Cox v. Wilson*, 971 F.3d 1159, 1171 (10th Cir. 2020)).

[107] *Id.* (alteration in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

[108] *Hope*, 536 U.S. at 741.

misconduct."[109]  The Court cannot find that this case involves the sort of extreme circumstances discussed by the Supreme Court in *Taylor*.  Plaintiff fails to make a particularized argument or showing as to any of the individual defendants on this claim.  And the Court cannot find on this record that it would have been obvious to the officers that their failure to intervene in the manner described by Plaintiff would have "crossed a constitutional line," given that such a claim had not ever been recognized outside of the excessive force context in the Tenth Circuit at the time.  Accordingly, the individual Defendants' motion for summary judgment on the basis of qualified immunity is granted as to Count III.

### 4. Conspiracy

To prevail on a conspiracy claim under § 1983, Plaintiff "must plead and prove not only a conspiracy, but also an actual deprivation of rights; pleading and proof of one without the other will be insufficient."[110]  The Court has already found that Plaintiff sufficiently demonstrated deprivation of her constitutional rights on the due process and malicious prosecution claims, so now the Court must determine if she sufficiently demonstrated a conspiracy.

For the conspiracy, there must be "at least a combination of two or more persons acting in concert and an allegation of a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective."[111]  The Court must be mindful that, "[f]requently, a conspiracy must be proven with circumstantial evidence because '[r]arely . . . will there be direct evidence of an express agreement among all the conspirators to conspire.'"[112]

---

[109] *Frazier*, 992 F.3d at 1021 (first quoting *District of Columbia  v. Wesby*, 583 U.S. 48, 64 (2018); and then quoting *Taylor v. Riojas*, 592 U.S. 7, 8–9 (2020)).

[110] *Snell v. Tunnell*, 920 F.2d 673, 701 (10th Cir. 1990) (quoting *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir. 1990)).

[111] *Frazier*, 992 F.3d at 1024 (quoting *Brooks v. Gaenzle*, 614 F.3d 1213, 1227–28 (10th Cir. 2010)).

[112] *Snell*, 920 F.2d at 701 (second alteration in original) (quoting *Bell v. City of Milwaukee*, 746 F.2d 1205, 1260 (7th Cir.1984)).

Plaintiff's only argument on the agreement component of her conspiracy claim is that a reasonable jury could conclude that Detectives Garrison and Michael acted in concert to withhold exculpatory evidence from Mr. Coones.  But Plaintiff wholly fails to point the Court to evidence in the record on which she relies for this proposition, and she wholly fails to address any of the evidence she relies on to support this claim against Defendants Block and Brown.  The mere fact that Defendants "engaged in '[p]arallel action . . . does not necessarily indicate an agreement to act in concert.'"[113]  Accordingly, the Court cannot find that Plaintiff has met her burden on summary judgment of showing that the individual officers acted in concert and had a meeting of the minds or a general conspiratorial objective when they deprived Mr. Coones of his constitutional rights.  Accordingly, Defendants' motion for summary judgment on the conspiracy claim in Count IV is granted.

### B.    Official Capacity Claims under § 1983—*Monell* Liability

Counts I through IV also allege official-capacity claims against the Unified Government.  "A municipality is not directly liable for the constitutional torts of its employees. . . .  But [it] may be held liable under *Monell* if it executes an unconstitutional policy or custom, or a facially constitutional policy that causes a constitutional violation."[114]  But "[a] municipality may not be held liable where there was no underlying constitutional violation by any of its officers."[115]  Here, the Court has determined that there is no genuine issue of material fact about whether there was an underlying constitutional violation by the individual Defendants on the conspiracy claim; thus, the Court grants summary judgment on the official capacity claim as well.

---

[113] *Frazier*, 992 F.3d at 1025 (alteration and omission in original) (quoting *Brooks*, 614 F.3d at 1228).

[114] *Finch v. Rapp*, 38 F.4th 1234, 1244 (10th Cir. 2022) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).

[115] *Johnson v. City of Cheyenne*, 99 F.4th 1206, 1233 (10th Cir. 2024) (quoting  *Wilson v. Meeks*, 98 F.3d 1247, 1255 (10th Cir. 1996)).

There is evidence to support a constitutional violation by Unified Government employees on the other three counts. To prove her *Monell* claim on these, Plaintiff must show: (1) "a municipal policy or custom—either an official rule or one so entrenched in practice as to constitute an official policy"; (2) "that the municipality was deliberately indifferent to constitutional violations that were the obvious consequence of its policy"; and (3) "that the policy directly caused his constitutional injury."[116]

The sum total of Defendants' motion for summary judgment on the *Monell* claim is that "[t]here is no admissible evidence of a policy, practice, or custom causing a violation of Pete Coones' constitutional rights."[117] They maintain that Plaintiff's claims are in fact contrary to municipal policy, which shields the Unified Government from liability. The Court disagrees that summary judgment is warranted on these cursory assertions.

Defendants limit their motion to addressing the first prong of the *Monell* claim. The Tenth Circuit has identified the following types of policies or customs for purposes of *Monell*:

> (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."[118]

---

[116] *Finch*, 38 F.4th at 1244.

[117] Doc. 101 at 34.

[118] *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (alteration in original) (quoting *Brammer–Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189–90 (10th Cir. 2010)).

3846

Here, Plaintiff asserts that the Board and the Unified Government failed to train or supervise its employees and had a widespread practice of not disciplining officers' civil rights violations, which directly caused the constitutional violations that led to Mr. Coones' wrongful conviction. Specifically, Plaintiff argues that at the time of the Schroll investigation, the homicide detectives' supervisor was Roger Golubski, an officer who is now under criminal indictment for sexual assault and sex trafficking, and whose misconduct was openly tolerated and overlooked within the department at that time. Plaintiff also points to evidence that civil rights complaints were categorized as "other contacts" complaints so they could be investigated outside of the internal affairs system without documentation, and that the KCKPD did not welcome reports about fellow officers. Plaintiff offers evidence that Golubski, the homicide detectives' supervisor, had eleven such "other contacts" complaints from 1993 to 2011, without receiving discipline, and that the KCKPD's priority of solving homicide cases drove the KCKPD's failure to supervise and train detectives to follow formal policies. Specific to this case, Golubski attended a meeting where Block shared information with Garrison and Michael about the elder abuse investigation, he signed off on the detectives' reports, and he assigned Block to attend the autopsies.

Rather than argue the merits of this evidence, Defendants maintain that it is inadmissible. Summary judgment evidence need not be "submitted 'in a form that would be admissible at trial.'"[119] But the proponent of the evidence must "show that it will be possible to put the information, the substance or content of the evidence, into an admissible form."[120]

---

[119] *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (quoting *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006)).

[120] *Id.* (citations omitted).

Defendants argue that much of the evidence relied on by Plaintiff to support its *Monell* claim is inadmissible because the affiants or deponents lack personal knowledge. But, as discussed in the fact section, Defendants' objections to Seifert's testimony are overruled and denied because Plaintiff has adequately established Seifert had personal knowledge of the statements relied on by Plaintiff. The Court likewise overrules Defendants' objections to the affidavits from victims who attest that Golubski had a pattern of fabricating and suppressing evidence. The Court has reviewed these affidavits and finds that they are based on the personal knowledge of various Kansas City, Kansas citizens who observed and interacted with Roger Golubski during his many years as a KCKPD officer. In considering the parties' statements of fact, the Court only relied on evidence that was based on personal knowledge.

Viewing the facts derived from admissible evidence in the summary judgment record in the light most favorable to Plaintiff, she has come forward with sufficient evidence to create a genuine issue of material fact about whether the Unified Government had a policy, practice, or custom that was the driving force behind the individual law enforcement officers' violations of Mr. Coones' constitutional rights. Thus, Defendants' summary judgment motion on the *Monell* claims is denied.

### C.   State Law Claims

#### 1.   Malicious Prosecution

Plaintiff alleges a state law claim for malicious prosecution against all Defendants. To state a malicious prosecution claim under Kansas law, a plaintiff must prove:

> (1) that defendant initiated, continued, or procured the proceeding of which complaint is made; (2) that defendant in doing so acted without probable cause; (3) that defendant must have acted with

malice; (4) that the proceedings terminated in favor of plaintiff;
and (5) that plaintiff sustained damages.[121]

Defendants move for summary judgment on the basis that this claim is barred by discretionary

function immunity, and the existence of probable cause.

Defendants first assert that they are immune from liability under the Kansas Tort Claims

Act ("KTCA"), which is a question of law for the Court to decide.[122]  Under the KTCA, the

general rule is that governmental entities and their employees are subject "to vicarious liability

under the doctrine of respondeat superior, making such entities liable for the tortious conduct of

their employees in the same way that a private employer would be."[123]  But the KTCA contains

many exceptions, including where an employee exercises a discretionary function:

> (5) any claim based upon the exercise or performance or the failure
> to exercise or perform a discretionary function or duty on the part
> of a governmental entity or employee, whether or not the
> discretion is abused and regardless of the level of discretion
> involved.[124]

Defendants bear the burden of showing that KTCA immunity applies.[125]  "[T]to determine

whether a government employee's function or duty is discretionary for the purposes of the

KTCA, courts must ask 'whether the judgment of the governmental employee is of the nature

and quality which the legislature intended to put beyond judicial review.'"[126]  Nonetheless, there

is no KTCA immunity for a law enforcement officer who commits an intentional tort such as

---

[121] *Lindenman v. Umscheid*, 875 P.2d 964, 974 (Kan. 1994).

[122] *Schreiner v. Hodge*, 504 P.3d 410, 422 (Kan. 2022).

[123] Id.

[124] K.S.A. 75-6104(a)(5).

[125] *Schreiner*, 504 P.3d at 423.

[126] *Id.* at 424 (quoting *Bolyard v. Kan. Dep't of SRS*, 912 P.2d 729, 733 (Kan. 1996)).

malicious prosecution.[127]    As described on Plaintiff's federal malicious prosecution claim, she

has sufficiently demonstrated evidence of malice to survive qualified immunity.  Discretionary

function immunity is therefore not available on this claim under Kansas law.

Finally, Defendants argue that the state law claim fails for the same reasons the federal

claim fails—a lack of probable cause for Mr. Coones' prosecution.  But for the reasons already

discussed on the federal claim, Plaintiff's evidence about the lack of probable cause is sufficient

to withstand summary judgment.  Defendants motion for summary judgment on the state law

malicious prosecution claim is therefore denied.

### 2.    Intentional Infliction of Emotional Distress

Plaintiff alleges a state law claim for intentional infliction of emotional distress against

all Defendants.  Under Kansas law, an intentional infliction of emotional distress claim has four

elements: (1) conduct of defendant must be intentional or in reckless disregard of the plaintiff,

(2) conduct must be extreme and outrageous, (3) there must be a causal connection between the

defendant's conduct and the plaintiff's mental distress, and (4) plaintiff's mental distress must be

extreme and severe.[128]    There are two threshold requirements that the court must determine: (1)

whether "the defendant's conduct may reasonably be regarded as so extreme and outrageous as

to permit recovery"; and (2) whether "the emotional distress suffered by the plaintiff is so

extreme the law must intervene because no reasonable person would be expected to endure it."[129]

Defendants state without analysis that Plaintiff cannot meet either threshold requirement

because the officers' conduct "was not 'beyond the bounds of decency' nor was it 'utterly

---

[127] *Tran v. City of Lawrence*, 653 F. Supp. 3d 894, 909 (D. Kan. 2023) (collecting cases); *see also Schreiner*, 504 P.3d at 429 ("[T]he KTCA's discretionary function immunity does not insulate officers from liability for damages arising from wanton or malicious conduct.").

[128] *Bolden v. PRC Inc.*, 43 F.3d 545, 553 (10th Cir. 1994) (citations omitted).

[129] *Id.* (quoting *Roberts v. Saylor*, 637 P.2d 1175, 1179 (Kan. 1981)).

intolerable in a civilized society.'"[130]  First, this argument goes to the first and not the second threshold requirement only.[131]  Second, as Plaintiff correctly argues, the Court is required to view the evidence in the light most favorable to her.  When applying that standard, the threshold requirements are met.  Plaintiff has submitted evidence that the law enforcement officers fabricated inculpatory evidence and withheld exculpatory evidence that led to Mr. Coones' wrongful conviction for the murder of Kathleen Schroll, causing him to spend more than ten years wrongfully imprisoned.  This is sufficient to trigger a jury trial on her intentional infliction of emotional distress claim.  Summary judgment is therefore denied.

### 3.      Conspiracy

Plaintiff alleges a state law claim for conspiracy against all Defendants, arguing that they agreed to suppress and fabricate evidence to secure Mr. Coones' wrongful conviction while acting within the scope of their employment.  To establish this tort claim at trial, Plaintiff must show, "(i) two or more persons, (ii) an object to be accomplished, (iii) a meeting of the minds in the object or course of action, (iv) one or more unlawful overt acts, and (v) damages as the proximate result thereof."[132]  Additionally, a conspiracy claim "is not actionable without commission of some wrong giving rise to a cause of action independent of the conspiracy."[133]

Defendants move for summary judgment on Plaintiff's state law conspiracy claim on the sole basis that Plaintiff cannot show there is an underlying tort independent of the conspiracy.  But, as discussed above, Plaintiff has demonstrated a genuine issue of material fact as to her

---

[130] Doc. 101 at 38 (quoting *Roberts v. Saylor*, 637 P.2d 1175, 1179 (Kan. 1981)).

[131] *See Roberts*, 637 P.2d at 1179 (explaining that the first requirement may be met "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society").

[132] *Reams v. City of Frontenac*, 587 F. Supp. 3d 1082, 1104 (D. Kan. 2022) (citing *Stoldt v. City of Toronto*, 678 P.2d 153, 161 (Kan. 1984)).

[133] *Id.* (citing *Stoldt*, 678 P.2d at 161).

malicious prosecution and intention infliction of emotional distress claims.  Thus, the Court must

deny Defendants' motion for summary judgment on the civil conspiracy claim.

### 4.      Indemnification

In Count V, Plaintiff alleges a claim against the Board and the Unified Government,

seeking payment for any judgment rendered against the individually-named Defendants.  The

KTCA provides that "a governmental entity is liable, and shall indemnify its employees against

damages, for injury or damage proximately caused by an act or omission of an employee while

acting within the scope of his or her employment."[134]  But "policies of indemnification lessen the

burden on state employees—they do not ensure a prevailing plaintiff's ability to collect on

judgments."[135]  Thus, Plaintiff does not have an independent cause of action against the

municipal Defendants for indemnification, and the Court grants Defendants motion for summary

judgment on this claim.

### 5.      Respondeat Superior

In Count X, Plaintiff alleges a respondeat superior liability claim against the Unified

Government on the basis that its employees' tortious conduct was within the scope of their

employment.  Defendants argues that respondeat superior is not an independent claim under

Kansas law.

Under the KTCA, "each governmental entity shall be liable for damages caused by the

negligent or wrongful act or omission of any of its employees while acting within the scope of

their employment under circumstances where the governmental entity, if a private person, would

---

[134] K.S.A. § 75-6109.

[135] *Couser v. Somers*, No. 18-1221-JWB-GEB, 2020 WL 6742790, at *13 (D. Kan. Nov. 17, 2020) (citation omitted), *report and recommendation adopted in part sub nom. Est. of Holmes by & through Couser v. Somers*, No. 18-1221-JWB, 2021 WL 236080 (D. Kan. Jan. 25, 2021).

be liable under the laws of this state."[136]   The Court need not reach the question of whether respondeat superior is an independent claim because in this case, the respondeat superior claim is duplicative of the other surviving state law claims that name the municipal Defendants.  Plaintiff alleges malicious prosecution and intentional infliction of emotional distress against both the individual and municipal defendants, and she does not articulate a basis for direct municipal liability on those claims.  Thus, Count X, alleging that "the Municipal Defendants are liable for the individual Defendants' torts"[137] is duplicative of their state law tort claims that already name the municipal Defendants under a respondeat superior theory of liability.  Summary judgment is therefore granted on Count X.

**IT IS THEREFORE ORDERED BY THE COURT** that all claims against Defendants Dorsett and Sanchez are **dismissed**; the malicious prosecution claims (Counts II and VI) against Defendants Block and Brown are **dismissed**, and the negligent infliction of emotional distress claim (Count VIII) is **dismissed**.

**IT IS FURTHER ORDERED BY THE COURT** that Defendants' Motion for Summary Judgment (Doc. 101) is **granted in part and denied in part**.  Summary judgment is granted as to: (1) the § 1983 individual-capacity claims against Defendants Block and Brown on Count I; (2) the § 1983 individual-capacity claims in Counts III and IV; (2) the § 1983 official-capacity claim in Count IV; and (3) the state law claims asserted in Counts V and X. Defendants' motion for summary judgment is otherwise denied.

**IT IS SO ORDERED.**

Dated: October 1, 2024

---

[136] K.S.A. § 75-6103(a).

[137] Doc. 96 at 23.

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DEIRDRE COONES, as executor of the estate
of Olin Coones,

Plaintiff,

v.                                                          Case No. 2:22-cv-02447-JAR-TJJ

BOARD OF COUNTY COMMISSIONERS OF THE
UNIFIED GOVERNMENT OF WYANDOTTE
COUNTY AND KANSAS CITY, KS, et al.,

Defendants.

---

## Notice of Appeal

Defendants hereby give notice that, as defendants in the above-captioned case, they hereby appeal to the United States Court of Appeals for the Tenth Circuit from those portions of the Memorandum and Order (Doc. 121) filed in this action on September 30, 2024 and the corrected Memorandum and Order (Doc. 122) filed October 1, 2024, which denied judgment on the basis of qualified immunity to which they are entitled (a question of law) with respect to plaintiff's claims under 42 U.S.C. § 1983, and all related adverse rulings in those Memoranda and Orders pertaining to these defendants. Defendants further appeal any and all prior adverse rulings related to their qualified immunity defense.

**Fisher, Patterson, Sayler & Smith, LLP**
3550 SW 5th Street | Topeka, Kansas 66606
Tel: (785) 232-7761 | Fax: (785) 232-6604
dcooper@fpsslaw.com | cbranson@fpsslaw.com

**s/David R. Cooper**
_____
David R. Cooper                                    #16690
Charles E. Branson                                 #17376
*Attorneys for Defendants*

Daniel E. Kuhn, #20429
Unified Government of Wyandotte
    County/Kansas City, Kansas
Legal Department
701 N. 7th Street, Suite 961
Kansas City, Kansas 66101
Tel: (913) 573-5060 | Fax: (913) 573-5243
Email: dkuhn@wycokck.org
*Attorney for Defendants Unified Government of*
*Wyandotte County and Kansas City, Kansas*

**Certificate of Service**

I hereby certify that on October 1, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record:

Joshua L. Loevy | Jonathan Loevy | Russell Ainsworth | Locke Bowman | Wally Hilke
LOEVY & LOEVY | 311 N. Aberdeen Street, 3rd Floor | Chicago, Illinois 60607
Tel: (312) 243-5900 | Fax: (312) 249-5902
joshl@loevy.com
jon@loevy.com
russell@loevy.com
locke@loevy.com
hilke@loevy.com

Brandon A. Bell | Lindsay Runnels
MORGAN PILATE, LLC | 926 Cherry Street | Kansas City, Missouri 64106
Tel: (816) 471-6694 | Fax: (816) 472-3516
bbell@morganpilate.com
lrunnels@morganpilate.com
**Attorneys for Plaintiff**

s/David R. Cooper
_____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**DEIRDRE COONES, Executor of the Estate of Olin Coones,**

      **Plaintiff,**

      v.

**UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY, KANSAS BOARD OF COUNTY COMMISSIONERS, et al.,**

      **Defendants.**

Case No. 22-2447-JAR

## MEMORANDUM AND ORDER

Plaintiff Deirdre Coones, as Executor of the Estate of Olin Coones, brings this action asserting federal civil rights claims and state law tort claims against Defendants Board Of County Commissioners of the Unified Government of Wyandotte County and Kansas City, Kansas ("Board"); Unified Government of Wyandotte County and Kansas City, Kansas ("Unified Government"); William Michael; Angela Garrison; Bryan Block; and Susan Brown. Plaintiff's claims arise out of her deceased husband Olin Coones' wrongful conviction for the murder of Kathleen Schroll. Before the Court is Defendants' Motion to Reconsider (Doc. 129) two rulings in the Court's September 30, 2024 Memorandum and Order granting in part and denying in part summary judgment ("September 30 Order"). The motion is fully briefed and the Court is prepared to rule. As described more fully below, the Court grants Defendants' motion to reconsider.

## I.    Background

The Court's September 30 Order set forth in detail the Court's reasons for granting in part and denying in part summary judgment on Plaintiff's many federal and state claims for

relief.  The Court incorporates by reference the background from that Order and assumes the reader is familiar with the facts.  In the Pretrial Order, Plaintiff alleged the following claims for relief under 42 U.S.C. § 1983 against Defendants in their individual and official capacities: (1) Count I—Due Process Violation based on fabricating and suppressing evidence; (2) Count II—Malicious Prosecution and Unlawful Pretrial Detention; (3) Count III—Failure to Intervene; and (4) Count IV—Conspiracy.  Plaintiff alleges the following claims under Kansas law: (1) Count V—Indemnification; (2) Count VI—Malicious Prosecution; (3) Count VII—Intentional or Reckless Infliction of Emotional Distress; (4) Count VIII—Negligent Infliction of Emotional Distress; (5) Count IX—Civil Conspiracy; and (6) Count X—Respondeat Superior Liability against the Board and the Unified Government.

After considering the evidence and arguments presented by the parties,[1] the Court granted summary judgment to Defendants Block and Brown on the § 1983 individual-capacity claims in Count I; to all remaining Defendants on the § 1983 individual-capacity claims in Counts III and IV; to all Defendants on the § 1983 official-capacity claim in Count IV; and to Defendants the Board and Unified Government on the state law claims asserted in Counts V and X.   The Court otherwise denied Defendants' motion for summary judgment.

## II.    Standard

Defendants move to reconsider under D. Kan. Rule 7.3:

> Except for motions under Fed. R. Civ. P. 59(e) or 60, parties
> seeking reconsideration of a court order must file a motion within
> 14 days after the order is served unless the court extends the time.
> A motion to reconsider must be based on:
>         (1) an intervening change in controlling law;
>         (2) the availability of new evidence; or

---

[1] Plaintiff voluntarily dismissed her claims against Defendants Dorsett and Sanchez, her malicious prosecution claims against Defendants Block and Brown (Counts II and VI), and her negligent infliction of emotional distress claim in its entirety (Count VIII).

(3) the need to correct clear error or prevent manifest injustice.

A motion to reconsider should not be used as "a second chance for the losing party to make its strongest case or to dress up arguments that previously failed."[2]  And it is "not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing."[3]

Defendants also cite Fed. R. Civ. P. 54(b), which provides that "any order or other decision, however designated, that adjudicates fewer than all the claims . . . may be revised at any time before the entry of a judgment adjudicating all the claims."  When considering an "interlocutory" motion under Rule 54(b), "'the district court is not bound by the strict standards for altering or amending a judgment encompassed in Federal Rules of Civil Procedure 59(e) and 60(b),' which govern a district court's reconsideration of its final judgments."[4]  Such a motion is left to the court's discretion.[5]

## II.    Discussion

Defendants move to reconsider the Court's September 30 Order to the extent it denied summary judgment on Counts VII and IX, arguing: (1) Plaintiff failed to establish sufficient evidence in support of the state law conspiracy claim alleged in Count IX; and (2) the Court erred by not granting summary judgment to Defendants Block and Brown on the state law claim for intentional infliction of emotional distress alleged in Count VII.

---

[2] *Ward v. Wesley Med. Ctr., LLC*, No. 23-1091-HLT-BGS, 2024 WL 989880, at *2 (D. Kan. Mar. 7, 2024) (quoting *Voelkel v. Gen. Motors Corp.*, 846 F. Supp. 1482, 1483 (D. Kan. 1994), *aff'd*, 43 F.3d 1484 (10th Cir. 1994)).

[3] *Id.* (quoting *Paliwoda v. Showman*, No. 12-2740-KGS, 2014 WL 11517806, at *1 (D. Kan. Sept. 30, 2014)).

[4] *Spring Creek Expl. & Prod. Co. v. Hess Bakken Inv., II, LLC*, 887 F.3d 1003, 1024 (10th Cir. 2018), *as revised* (Apr. 13, 2018) (quoting *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1223 n.2 (10th Cir. 2008)).

[5] *Id.*

On Count IX, Plaintiff voluntarily agrees to dismiss this claim. Thus, Defendants' motion to reconsider the Court's ruling as to Count IX is granted and the state law conspiracy claim is dismissed.

On Count VII, Defendants argue that the Court improperly imputed evidence about Defendants Michael and Garrison's conduct to Defendants Block and Brown. Defendants point to the Court's rulings on the federal due process claim, in which it found insufficient evidence to support the intent required on that claim by Block and Brown, and argue that the same findings require a favorable ruling on the intentional infliction of emotional distress claim. Plaintiff responds that this is a new argument that was not raised in the original motion, and that Defendants fail to demonstrate that the standard used on the federal due process claims is the same as the intentional infliction of emotional distress claim.

The Court agrees with Plaintiff that this is a new argument that was not raised below. Defendants' only argument in its opening brief was that "[t]he Officers' conduct was not 'beyond the bounds of decency' nor was it 'utterly intolerable in a civilized society.'"[6] This Court disagreed, ruling that when viewing the evidence in the light most favorable to Plaintiff, law enforcement officers fabricated inculpatory evidence and withheld exculpatory evidence that led to Mr. Coones' wrongful conviction for the murder of Kathleen Schroll, causing him to spend more than ten years wrongfully imprisoned. Defendants made no attempt to distinguish between the different Defendants' conduct, nor did they make any arguments about the individual Defendants' intent—a different element of the claim.

Nonetheless, the Court is not prohibited from considering Defendants' new argument on this motion given that it is reviewing an interlocutory order. Although it was not clearly

---

[6] Doc. 101 at 38.

erroneous for the Court to fail to consider an argument that Defendants did not make, the Court will exercise its discretion to consider whether its rulings were inconsistent on Block and Brown's intent.

On the due process claim, the Court found that Plaintiff submitted evidence in support of her claim that the individual Defendants withheld and failed to preserve certain exculpatory evidence, and that Michael fabricated evidence about Mr. Coones' van not being at his home on the morning of the Schrolls' deaths.  Plaintiff is also required to demonstrate on this § 1983 claim that the individual defendants had "'direct personal responsibility for the claimed deprivation of [Mr. Coones'] constitutional right[s]' under *Brady*, or *Trombetta/Youngblood*,"[7] and that "they acted with the requisite mental state."[8]  Specifically, Plaintiff must show that the officers acted "with deliberate or reckless intent."[9]  Applying this standard to Block and Brown, the Court found:

> [T]here is no evidence demonstrating either personal participation on these issues or intent on behalf of Detectives Block and Brown. There is no evidence about Brown's role in withholding or failing to preserve any of this evidence.  Block was originally assigned to the elder abuse investigation and passed along information to the homicide detectives about that.  But there is no evidence that he made an affirmative decision to withhold the KBI Report from the homicide investigative file.  Thus, the Court finds that summary judgment is warranted on these claims as to Detectives Block and Brown.[10]

Under Kansas law, an intentional infliction of emotional distress claim has four elements: "(1) conduct of defendant must be intentional or in reckless disregard of the plaintiff, (2) conduct

---

[7] *Johnson v. City of Cheyenne*, 99 F.4th 1206, 1232 (10th Cir. 2024) (emphasis omitted) (second alteration in original) (quoting *Porro v. Barnes*, 624 F.3d 1322, 1327 (10th Cir. 2010)).

[8] *Id.*

[9] *Id.* (collecting cases).

[10] Doc. 121-1 at 37.

must be extreme and outrageous, (3) there must be a causal connection between the defendant's conduct and the plaintiff's mental distress, and (4) plaintiff's mental distress must be extreme and severe."[11]   There are two threshold requirements that the court must determine: (1) whether "the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery"; and (2) whether "the emotional distress suffered by the plaintiff is so extreme the law must intervene because no reasonable person would be expected to endure it."[12]

The Court did not consider the intent element of this claim in its September 30 Order because Defendants failed to move on that element.  The Court considers it now in light of its findings on the due process claim, which also requires that each defendant's conduct be intentional or in reckless disregard of Plaintiff.  For the same reasons cited by the Court on the due process claim, the Court agrees with Defendants that the summary judgment record, when viewed in the light most favorable to Plaintiff, does not demonstrate intentional or reckless conduct by Block or Brown.

The summary judgment record supports that both detectives handled the elder abuse investigation of Mr. Coones' father that preceded the Schrolls' deaths.  During this investigation, a Kansas Bureau of Investigation ("KBI") document examiner reviewed 120 checks purportedly signed by Pete Coones Senior, and found "strong indications" that all but three may not have been authored by him.  This report lists Kathleen Schroll's name as the suspect.  There is evidence that Mr. Coones' defense attorney, Patricia Kalb, requested exculpatory information from Block and Brown but that this report was not produced to her before his trial.  In its

---

[11] *Bolden v. PRC Inc.*, 43 F.3d 545, 553 (10th Cir. 1994) (citations omitted).

[12] *Id.* (quoting *Roberts v. Saylor*, 637 P.2d 1175, 1179 (Kan. 1981)).

3870

September 30 Order, the Court specifically found that there was no evidence that Brown had knowledge of the existence of the KBI Report when Kalb requested it.

It was also undisputed that the KBI report was not included in the Schroll death investigation case file with the other documents from that investigation. Instead, Detective Block placed it in his personal file. Kalb spoke to detective Block before trial, and he did not mention sending checks to the KBI or the KBI report itself. But he did testify at trial that Kathleen drained Pete Coones Senior's bank account when she worked for him. The Court found that Plaintiff fell short of demonstrating intentional or reckless conduct by Block on the due process claim.

Because Plaintiff argued on summary judgment that the same conduct that forms the basis of the due process claim—withholding and fabricating evidence—forms the basis of the intentional infliction claim, the Court agrees with Defendants that its intent ruling on the two claims should be consistent. The Court therefore reconsiders its summary judgment ruling on Count VII, and grants summary judgment in favor of Defendants Block and Brown.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion to Reconsider (Doc. 129) is **granted**. The motion to reconsider is **granted** as to the state law conspiracy claim, and **Count IX is dismissed with prejudice**. The motion to reconsider is **granted** as to Defendants Block and Brown on the intentional infliction of emotional distress claim in Count VII.

**IT IS SO ORDERED.**

Dated: November 14, 2024

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE